(Decided January 8th, 1896.)

---

# THE WESTERN UNION TELEGRAPH COMPANY OF BALTIMORE CITY AND THE CITY AND SUBURBAN RAILWAY COMPANY *vs.* STATE OF MARYLAND, USE OF EDWARD NELSON.

*Injury from Electric Wire—Presumption of Negligence—Evidence Pleading—Misnomer—Amendment—New Party—Limitations.*

An unused telephone wire strung on the poles of a telegraph company, one of the defendants, along the sidewalks of a city street, was broken, and one end fell over and across the electric feed wire on the poles of a railway company, the other defendant, and extended to the pavement, where it hung for two weeks. In some way not shown this wire became charged with electricity, and plaintiff's son, a child of eleven, came in contact with it while passing along the street and was killed. In an action against both companies, *Held*,

1st. That the defendants, using on the highway dangerous agencies, were bound so to manage them as not to injure persons lawfully upon the streets, and if, because their appliances are not in good order, a person is injured, a *prima facie* presumption of negligence arises, in the absence of evidence showing that the defect originated without the fault of the defendants.

2nd. That the fact that the unused wire had been hanging across the electric feed wire for two weeks, damaging the insulating material

of the latter by rubbing against it, was sufficient evidence to go to the jury to show that it was charged from the feed wire, which could only have been owing to a defect in the insulation, although such insulation was not proved to be imperfect.

3rd. That it was competent for the defendants to show that the insulation was perfect, or that the defect was caused by circumstances over which they had no control, or that it had existed for so short a time before the accident that they had no opportunity to remedy it. But it was not necessary for the plaintiff to negative all the possible circumstances which might relieve the defendants from liability.

In the declaration and summons the defendant was referred to as the W. U. Tel. Co., but in the bill of particulars filed with the *narr.* the words "a corporation of the State of New York" were appended to the name. The writ was served on B., "manager." At the trial it appeared that there were two corporations, one the W. U. Tel. Co., the other the W. U. Tel. Co. of Baltimore City. B. was the resident manaager of both, and also president of the latter corporation. The plaintiff, upon leave granted, amended the pleadings by adding the words, "of Baltimore City," to the name of the defendant. Thereupon defendant pleaded that the cause of action did not accrue within twelve months before the filing of plaintiff's amended declaration. This plea was upon motion struck out. *Held*, that the plaintiff was entitled to make the amendment and that the same did not bring in a new party, and that the defendant had no right to plead limitations computed as of the time of filing the amended declaration.

Appeal from Baltimore City Court.  The facts appear in the opinion of the Court.  At the trial the plaintiff offered the following prayers :

1st.  That if the jury find from the evidence in the case that on the 24th day of August, 1893, Michael A. Nelson, the son of the equitable plaintiff, while upon Eastern avenue, a public highway in the city of Baltimore, and using due care upon his part, came in contact with a broken wire which had been suspended for a period of about two weeks in and upon said highway from one of the poles of the Western Union Telegraph Company of Baltimore City, one of the defendants, hanging over and in contact with one of the electric feed wires of the City and Suburban Railway Company, the other of the defendants ; and that the said broken wire in this condition became charged with a dangerous current of electricity from the feed wire afore-

said, and that the said son of the equitable plaintiff coming in contact with said broken wire suspended as aforesaid and was severely shocked, burned, injured by reason of which he died on the 7th day of September following, that then the plaintiff is entitled to recover.   (Granted.)

2. The plaintiff prays the Court to instruct the jury that if they find a verdict for the plaintiff, they are to award to him such damages as they may believe will be an adequate compensation for the loss of his son's services from the time of his death, said services not to be calculated beyond his majority.   (Granted.)

The prayers submitted by the City and Suburban Ry. Co. were as follows:

1st. That there has been no evidence offered in this case legally sufficient to show that the death of the ssid Nelson was caused by the negligence of the said City and Suburban Railway Company, and the verdict of the jury must be for the said City and Suburban Railway Company.   (Rejected.

2nd. That there has been no evidence offered in this case legally sufficient to show that the discharge of electricity which injured the said Michael Nelson came from a defective condition of the wires of the City and Suburban Railway Company·   (Rejected.)

3rd. That unless the jury believe that the small wire which was in contact with Nelson received a current of electricity by reason of the defective condition of the electrical plant of the City and Suburban Railway Company, and that a current of electricity, sufficient to injure said Nelson in the manner described in the evidence, flowed from said wires into said small wire, and thereby injured said Nelson, the verdict of the jury must be in favor of the City and Suburban Railway Company.   (Granted.)

4th. That if the jury do not believe the insulating material was worn off the feed wire when the small wire came in contact with it when Nelson was injured, their verdict must be in favor of the City and Suburban Railway Company.   (Granted.)

5th. That there has been no evidence offered in this case legally sufficient to show that the three feed wires of the Railway Company, at and near pole No. 3819, near which Nelson was injured, which were there at that time, have ever been changed, altered or repaired since the date of the accident, and the jury, in considering the case, must believe as true that the three upper feed wires of the Railway Company, now near pole No. 3819, are the same wires and in the same condition as they were at the time of the accident, except as they may have been affected by the elements since that time. (Rejected.)

6th. That the fact that Nelson, when in contact with the small wire, may have moved from the side of the street towards the centre as the car of the said Railway Company approached him, does not show that the current in the small wire came from the Railway Company's feed wire, and the movements of Nelson across the street on the approach of the car must not be considered by the jury as showing that there was any electricity coming from the City and Suburban Railway Company's feed wires through the small wire in contact with it. (Granted.)

The first prayer offered by the Western Union Tel. Co., the other defendant, related to the legal sufficiency of the evidence. Its second and third prayers related to the plea of limitations. Its fourth prayer was to the effect that if the wire which caused the injury was not owned and controlled by it, then it was not liable, although the wire was hanging from a pole of the defendant. All of these prayers were rejected.

The Court below (PHELPS, J.), granted both prayers of the plaintiff, and also the third, fourth and sixth prayers offered by the City and Suburban Ry. Co., and rejected its first, second and fifth prayers, and also granted an instruction at the instance of both defendants, by which the damages recoverable were limited to the pecuniary value of the services of plaintiff's son until his arriving at the age of twenty-one, less the expense of his maintenance.

At the request of the defendant the following interrogatories were put to the jury:

First Interrogatory.  Do you find as a fact that the insulation was so worn off of the three feed wires, or any of them, of the Railway Company, near pole 3819, that the small wire, at the time of the accident, could have received a charge of electricity by contact with any of these feed wires?

Answer.  Yes.

Second Interrogatory.  Since the date of the accident, have any of the three feed wires there at that time been changed, altered or repaired as to insulated covering?

Answer.  No.

Third Interogatory.  Do you find as a fact that Michael Nelson received a current of electricity when he came in contact with the small wire, while it was in contact with one of the feed wires of the Railway Company, and that the current of electricity came from such feed wire?

Answer.  Yes.

Fourth Interrogatory.  Does the fact that Nelson, while in contact with the small wire, moved from the side to the centre of the street as the electric car owned by the railway approach, show that the small wire was getting its current from the feed wires of the Railway Company?

Answer.  No.

Fifth Interrogatory.  Do you find that the fact that Michael Nelson received a current of electricity when he came in contact with the small wire, while said small wire was in contact with the feed wires of the Railway Company, proves that the current of electricity came from said feed wires?

Answer.  Yes.

Sixth Interrogatory.  If you should find for the plaintiff, please give the amount of money you think the said Michael Nelson would earn in each year up to the date of his majority, and also the items of the expense of maintenance, education, clothing and care of said Michael Nelson from

the date of his death to the time he would have attained his majority.?

Answer.  We find that the said Michael Nelson's services would have been worth an average of one hundred and ten dollars per year to his parents above all costs of maintenance, education, etc., for the year, from eleven to sixteen years of age, and an average of seven hundred and fifty dollars per year above all cost of maintenance, education, etc., from the age of sixteen until he reached his majority, making a total of five hundred and fifty dollars for the first five years, and a total of three thousand seven hundred and fifty dollars for the latter five years, making a grand total of forty-three hundred dollars for the period of ten years.

The jury returned a verdict for the plaintiff against both defendants for $4,300.

The cause was argued before ROBINSON, C. J., BRYAN, McSHERRY, FOWLER, BRISCOE, PAGE and BOYD, JJ.

*W. Irvine Cross* and *Geo. Dobbin Penniman* (with whom were *John K. Cowen* and *E. J. D. Cross* on the brief), for the appellants.

The plaintiff claimed, as against the Railway Company, that the small wire received its current from the insulated feed wire, with which it was in contact.  The Railway Company contends that there was certainly no evidence tending to show that the insulation of its feed wires, at the time of the accident, had been so destroyed, or was in such an imperfect condition that the electricity could escape from the feed wires.  The *uncontradicted* evidence in the case is, that when the insulation of the feed wires, at the place where the small wire touched them, was examined within half an hour after the accident, the insulation was found to be perfect.  The plaintiff did not attempt to produce any direct testimony to show that the insulation of the feed wires, at the place where the small wire touched them, was imperfect or worn in any way.  The electrical experts all agree, that

to obtain sufficient current to produce the severe burns re-
ceived by Nelson, the small wire would have to be in actual
contact with the *metal* of the feed wire, and this would
necessarily cause a hole in the insulating covering which
would be evident.   The flow of a sufficient amount of cur-
rent from the feed wire to the small wire to severely burn
Nelson would also cause more or less sparking at the point
of contact between the two wires; this would still further
destroy the insulating material and make the place of con-
tact more evident.   The uncontradicted evidence is further
that at the time of the accident the balance of the wire,
one end of which was in contact with Nelson, extended
up the street into the city for at least two squares.
This wire, as it extended westwardly into the city, might
have received a current from sources of electricity other
than from the feed wires at the place of the accident, or
as the small wire was strung on poles along Eastern
avenue, it may have received its current from contact with
the Railway Company's wire at *some other point* far distant
from the scene of the accident, and under circumstances
which would not show negligence on the part of the Rail-
way Company.

  The Railway Company's defence to this action is that
there has been no evidence offered in this case legally suffi-
cient to show that Michael Nelson's death was caused by
the negligence of the railway, *i. e.*, that the current which
charged the small wire was received through contact with
the feed wire where it hung over that wire, near the tele-
graph pole; or that it received the current through con-
tact with any other portions of the Railway Company's
electrical equipment, under circumstances which showed
negligence on the part of the company.   This defence was
properly raised by a prayer put in at the close of the plain-
tiff's case, and a prayer at the close of the whole case.   It
was also raised by special exception to the granting of the
plaintiff's first prayer, on the ground of the failure of evi-
dence to sustain the plaintiff's prayer.   The plaintiff must

prove that the accident resulted from the negligence of the Railway Company in *some* way.

The small wire from the lug on the pole to the ground was about twenty-two feet long. The plaintiff's theory was that by the swaying of the wire by the wind for two weeks, the insulation on the feed wire had been worn through and the contact between the two metals obtained. Necessarily, there would not be much swaying of the wire when the wind was at right angles to the feed wires which ran east and west. The feed wires were covered with three coats of insulating material and are known as "Washburn and Wroburn three-braid insulated wire." It was the best wire in the market. (It was agreed that specimens of the wire should be shown in this Court as the best description of the character of the insulation. A good illustration of the absurdity of the plaintiff's position that the light weight of the small wire could wear through the insulation by ordinary friction from the wind in two weeks can be obtained by endeavoring to wear away the insulation by rubbing it with a small wire or even endeavoring to cut it with the ordinary penknife.) The accident happened on August 24, 1893 ; the wires had been put up during the spring of the same year. The insulation had only been exposed to the effects of the weather for about six months, and in that short period the weather would have no appreciable effect. The experts on both sides agreed that feed wires of this make would be perfectly insulated and there would be no escape of electricity if the insulation was in good order, either from the large copper insulated wire of the feed wire to the small wire, or from the small wire through the insulation to the copper feed wire. It could very probably happen, therefore, that the small wire did obtain its current at some other point, and yet touch the feed wire without doing any damage. The plaintiff was bound to prove that the current could have come from the feed wire.

The plaintiff did not offer the slightest bit of evidence to the effect that the surface of the insulation of the feed wire

at the place where the small wire rested upon it, showed the slightest abrasion or defect of any kind. The plaintiff had every opportunity to obtain such evidence if in fact it had existed. Abrasion or defect was an easily ascertained fact which should be proved as any other fact. An electrician was present at the time of the accident, and testifies that the small wire was hanging over the feed wire, yet this man, whose attention must undoubtedly have been attracted to the feed wire and the possibility of the small wire obtaining its current from the feed wire, does not testify that the insulator, as far as he could observe it, was in any way defective, or that he noted any of the usual signs of sparks, burning, etc., well-known to electricians, when a powerful current is flowing from one wire to another through a contact necessarily not very perfect. Hill, the electrical expert employed by the plaintiff for the express purpose of preparing the case and testifying in it, says that he visited the scene of the accident four or five times, and yet, with every incentive to discover a defect in the insulation or a repair, the plaintiff could not show by him that the insulation was in the slightest way worn or defective. There was a telegraph pole within three feet of the portion of the feed wire, upon which the small wire rested, and any telegraph lineman in five minutes could have detected any defect in the insulation of the feed wire or repair of such defect, and yet there was no such proof by the plaintiff. The same wire is there, according to the uncontradicted proof in the case, and it has not been repaired in any way. It is impossible, according to the testimony of both sides, for such an amount of electricity to flow from the feed wire unless that wire is bared at the point of contact, and at such a point of contact the insulation must be worn away " to a rather marked extent."

*Isidor Rayner* and *Isaac Lobe Strauss* for the appellee.

The expression " *evidence of negligence* " is a technical term employed to designate that "collocation of facts," which,

if believed by the jury, will warrant them in finding that the defendant has been guilty of negligence productive of damage to the plaintiff. In certain cases, the duty which the defendant owes to the plaintiff is of such a nature that proof that the accident happened to the plaintiff under certain circumstances will be of such legal value as to constitute evidence of negligence on the part of the defendant, and present a *prima facie* case in favor of the plaintiff. The doctrine of these cases is expressed in the maxim *res ipsa loquitur*. It is intimately connected with the question of the burden of proof. When the plaintiff, having himself used due care, has introduced evidence sufficient as matter of law to charge the defendant with negligence, the burden of proof shifts, and the defendant must exonerate himself to escape the payment of damages. The testimony of the plaintiff's witnesses, as set forth in the record, presents such a combination of facts and circumstances to which the doctrine *res ipsa loquitur* clearly applies.

As to the insulation on the feed wire, the evidence established that its material becomes impaired and deteriorated by various causes and influences, almost all of which are shown by the testimony to have possibly operated in this particular case. Under such conditions the accident occurred, and immediately after the casualty the company's men hasten to the scene and remove the hanging wire from its dangerous position. Besides this, every witness for the defendant who has testified upon this point, has admitted that the very circumstance that occurred in this case, the rubbing of the telegraph wire against the feed wire, would wear away the insulation and cause a contact through which the current could flow. In the face of such circumstances, it is submitted that the burden is devolved upon the defendant Railway Company to prove that it was guilty of no default; that its plant was in an absolutely perfect condition, and the current that injured the boy did not come from its wire, but from some other source. This is the well settled doctrine that has been applied again and again

to cases of this sort.    The decisions are, in fact, so numerous and uniform upon this point, that we beg leave to omit any description of them in this brief, and we give merely the cases and the volumes in which they are reported.    They speak for themselves.    *Haynes* v. *Raleigh Gas Light Co.*, 19 S. E. Rep. 344; *S. W. Tel. Co.* v. *Robinson*, 50 Fed. Rep. 813; 2 U. S. App. 205; *Thomas* v. *W. U. Tel. Co.*, 100 Mass. 156; *Transp. Co.* v. *West. U. Tel. Co.*, 8 Benedict's Dist. Ct. Rep. 502; *Dickey* v. *Mc. Tel. Co.*, 46 Me. 483, 484, 487; *Uggla* v. *Railway Co.*, 160 Mass. 351; *W. U. Tel. Co.* v. *Eyser*, 2 Col. 141, 163–4; *Kearney* v. *London, etc., R. R. Co.*, L. R. 5 Q. B. 411, and L. R. 6 Q. B. 759; also reported in 2 *Thomps. Neg.*, page 1220; *Wolf* v. *Erie Tel. Co.*, 37 Fed. Rep. 320, 322; *Brush Electric Light Co.* v. *Kelly*, 126 Ind. 220; *Urlson* v. *Great South. Tel. Co.*, 41 La: An. 1041; 2 *Thompson, Negligence*, page 1227; *Whittaker's Smith on Negligence*, ch. iv., title, *Res ipsa loquitur*, pages 419, 420–1; *Ray, Negligence of Imposed Duties*, page 694; *Stockton* v. *Frey*, 4 Gill, 407; *R. R. Co.* v. *Worthington*, 21 Md. 283; *R. R. Co.* v. *Andrews*, 39 Md. 353; *Murray* v. *McShane*, 52 Md. 217.

The Court very properly rejected the first prayer of the Western Union Telegraph Company.    The proof is that the wire that injured the boy was strung on the poles of the Western Union Telegraph Company during the entire period that it had owned and operated the telegraph system along the highway which was the *locus in quo;* that the said wire became detached and broken, and hung from one of the poles of the defendant, over and around the feed wire immediately beneath it.    The proof further showed that it was allowed so to hang from the said pole into the street and upon the sidewalk for a period of two weeks or more, and that it was heavily charged with electricity and fraught with deadly peril to persons rightfully passing near it.    The defendant company made no attempt to remove it from its poles, or to put it in a position that would avoid danger to pedestrians traveling upon the street.    Neither

did it undertake to separate it from contact with the feed wire of the Railway Company. That such conduct is flagrant and criminal negligence, the authorites upon the subject have repeatedly and emphatically settled. *S. W. Tel. Co.* v. *Robinson,* 50 Fed. Rep. 813 ; 2 U. S. App. 205 ; *Sheldon* v. *W. U. Tel. Co.,* 51 Hun. 591 ; *Blanchard* v. *W. U. Tel. Co.,* 60 N. Y. 510 ; *West. U. T. Co.* v. *Eyser,* 2 Col. T. 141 ; *Dickey* v. *Me. Tel. Co.,* 46 Me. 483, 484, 487 ; *Thomas* v. *Tel. Co.,* 100 Mass, 156 ; *Thompson on Elect.,* secs. 70, 71, 78 ; *Transp. Co.* v. *Tel. Co.,* 8 Benedict's Dist. Ct., (N. Y.) Rep. 502 ; *Wolfe* v. *Erie Tel. Co.,* 33 Fed. Rep. 320, 322 ; *Brush Co.* v. *Kelley,* 126 Ind. 220 ; *Urlson* v. *Tel. Co.,* 41 La. Ann. 1041 ; *1 Wood, Nuisance,* (3d ed.) secs. 282, 284, 301, 754.

Admit that the wire was a worthless and abandoned one. It had been permitted to be upon the poles of the company for years. It had been hanging in the street and on the sidewalk from the pole for two weeks and over, and in contact with a feed wire heavily charged with electricity, and directly beneath the telegraph wires on the pole. By permitting such a condition of things to exist, the defendant company gravely failed in its duty to the public and to the deceased. It was using the public street for its private gain under a grant from public authority. Its duty to persons upon the street plainly was to maintain its system, and to conduct and operate the same in such a manner as not to injure them. Its obligation to the deceased, as he passed rightfully along the street, was to keep out of his way, as far as its system of poles were concerned, all wires attached to the same, and to prevent by proper diligence his exposure to contact with any wire upon its poles. If its poles, or any of them, contributed to bring a dangerous wire in contact with the deceased, the company is liable. Under the law it was the duty of the defendant to keep the highway along which it constructed its line of poles, substantially in the same condition as to convenience and safety, as it was before the poles were there. In the discharge of

this duty it grossly and guiltily failed, and is consequently responsible for any injury inflicted by its fault upon another. *Haynes* v. *Gaslight Co.*, 19 S. E. Rep. 346, and cases cited in Brief, page 18; *Mersey Dock's Trustees* v. *Gibbs et al.*, L. R. 1 H. L. 93; 1 Code, Art. 23, sec. 224.

PAGE, J., delivered the opinion of the Court.

This action was brought against the "Western Union Telegraph Company," and "The City and Suburban Railway Company," to recover damages for the alleged neglect of the defendants, whereby one Michael Nelson lost his life.

In the *narr.* and summons the Telegraph Company is referred to as "The Western Union Telegraph Company," but in the bill of particulars, filed with the *narr.*, the words "a corporation of the State of New York," are appended to the corporate name. The summons was served on Richard Bloxham, "its manager." During the trial, it appeared from the evidence that there are two companies; one, whose corporate name is "The Western Union Telegraph Company," a corporation of the State of New York, and another whose corporate name is "The Western Union Telegraph Company of Baltimore City," a corporation of the State of Maryland. Richard Bloxham (on whom the writ was served), is the general manager of the former in this State, and the president and manager of the latter. The evidence established the facts, that the pole on which the fatal wire was suspended, is the property of the Maryland corporation, and that the New York Company neither owned nor controlled poles in that vicinity. Thereupon, the counsel for the plaintiff asked leave to amend the declaration and bill of particulars to conform to the proof, and stated, at the time, that the Maryland Company was the one intended to be sued and it was only because of his want of knowledge as to the correct name of the corporation, that the words "of Baltimore City," had been omitted. There being no objection, the leave was

granted and the amendment made.   Mr. Cross, who was
the counsel for the defendants, then had his appearance
entered for the Western Union Telegraph Company of
Baltimore City, and filed the three following pleas, viz.:
1st. The plea of limitations.    2nd. That the cause of
action did not accrue within twelve months " before the filing
of the plaintiff's amended declaration, by which it was made
a party to the suit;" and 3rd. The general issue plea. The
plaintiff, having joined issue on the first and third of these
pleas, moved to strike out the second; and the action of
the Court in granting this motion constitutes the defen-
dant's second exception.

It is contended on behalf of the Telegraph Company,
that by the amendment a new party was made and was, in
fact, so far as it was concerned, the equivalent of bringing
a new suit; and therefore a plea which averred that the
cause of action did not accrue within twelve months before
the filing of the amended declaration, did not improperly
set out that provision of the Code, which provides that
actions like the present must be commenced within twelve
months after the death of the deceased person.   Code,
Art. 67, sec. 3.    But to this we cannot agree.   The 36th
sec. of Article 75 of the Code provides that no action shall
abate by reason of the misnomer of a defendant, but the
Court, at its discretion on suggestion, &c., or other proof
to the satisfaction of the Court, that "by mistake the
plaintiff has sued in a wrong name or that the party sum-
moned in virtue of said writ or action is in fact the party
intended to be sued by such writ or in such action may at
any time before judgment, direct the writ or any of the
proceedings to be amended by inserting therein the true
name" of any defendant.    In this case, the summons was
served on a person who was an officer of both companies,
and upon him as manager of the defendant corporation.
He was in fact the manager of both.   The service was effi-
cient to bring into Court either one of the companies.  Under
the circumstances it might well happen that an attorney who

was closely connected with both, and knew the very slight
differences in the two corporate names, might fall into error
as to which company was intended to be sued, but if he
did, his mistake could not operate to deprive the plaintiff
of his right, when he discovered there were two compa-
nies with names so nearly alike, of designating which of
the two he was sueing.   When, therefore, the suggestion
of misnomer was made, with the statement that it was the
Maryland corporation which was intended to be sued and the
Court, in its discretion, ordered the amendment to be made,
not for the purpose of adding a new party, but to correct
the name of a party actually summoned, the defendant could
thereby acquire no right to interpose any other or different
plea than it would have had if it had been correctly named
in the first instance.   If, upon the amendment being made, the
ends of justice required further time, to enable the defen-
dant properly to prepare its case, the Court had full power
to order a continuance.   It does not appear, however,
ever, that the counsel for the defendant asked for or desired
delay.   He could not have been surprised.   The *narr.* dis-
closed that the negligence complained of, was in connection
with a wire on Eastern avenue near Luzerne street, and
Bloxham, who was manager of both companies, knew, or
ought to have known, that the telegraph poles and wires in
that locality were owned or controlled by the Maryland
Company, and that the New York Company had none in
that vicinity.   He therefore must have known that it was
the Maryland Company that was intended to be sued, and
it did not require much mental acuteness to enable him to
understand that the misnomer occurred by reason of the
very slight difference in the two names.   It is plain that the
error of the plaintiff's attorney was due to the fact that he
did not know that the company he intended to sue had the
words " of Baltimore City " as a part of its name, and as
soon as he became better informed he so stated to the
Court and prayed the amendment.   To hold, under such
circumstances, that the amendment brought in a new party

and thereby enabled it to plead limitations, to be computed from the filing of the amended declaration and not from the commencement of the action, would be a gross injustice to the plaintiff.

It follows from what has been said that we find no error in the second and fourth exceptions, or in the rejection by the Court of the second and third prayers of the Telegraph Company. By the fourth exception it appears that the defendants were not permitted to offer in evidence the charter of the New York Company. But it was not a party to the suit and the contents of its charter were wholly irrelevant to any of the issues before the Court or jury.

The first exception was not referred to in argument and we understand was abandoned. The remaining exceptions present for our consideration the several instructions granted and rejected by the Court, and this renders necessary a statement of the main facts of the case.

On August 24th, 1893, Michael Nelson, a child of eleven years, while walking on Eastern avenue near Luzerne street, came in contact with a telephone wire which hung from a pole owned and controlled by the Western Union Telegraph Company of Baltimore City. Along that part of Eastern avenue the City and Suburban Railway Company operates one of its lines of electric railway. Its iron poles are placed at intervals along the curb line, and carry wires strung across the street to support the trolley wire in the middle of the street. Besides these, they also support the railway's feed wires, which stretch from pole to pole along the street, over the curb line and parallel to it. The function of these feed wires is to supply electricity to the trolley wire, so that the potential of that wire may be always constant, and when the road is being operated they carry a voltage of about 500 volts, sufficient to produce upon any one receiving it serious injury or death. By means of a preparation of braided cotton, saturated with insulating material and covered with a water-proof compound, feed wires are kept insulated, so that when the insulation is prop-

erly done and in good condition, there can be no escape of electricity. If exposed, however, long to atmospheric influence it becomes depreciated and will not serve its purpose. Defects are also sometimes to be attributed to improper handling of the wire in the process of construction so that the covering becomes broken. The frictional contact of another wire rubbing against it would cause serious damage to the insulation and in such a case the current would commence to be carried off before the insulation was "probably absolutely worn through." If imperfect insulation were due to such rubbing, so that the charged wire was laid bare or so worn as that the current found a path to the over-hanging wire, there would be no sparks at the point of contact, unless there was an "arcing or air space" between the two. The defendant offered evidence tending to show that the particular feed wire was erected in 1893. It was not contended that the insulating material was not of the best or that it was not originally put up in a proper manner. The defendants also offered evidence to show that at the time of the accident the insulating material was intact at the place where the telephone wire rested on it. It was shown the swinging wire did not belong to the Telegraph Company, but was suspended from a bracket or lug on one of its poles. It was erected with the permission of the company by a gentleman for his private uses. It had long been unused, but was permitted by the company to remain, a dead wire, on the poles where it was first placed. In some manner it parted and one of the ends suspended from the lug passed over or around the feed wire and extended to the pavement, where it swayed to and fro in the wind. In this position it remained for at least two weeks. At first it seems not to have been charged with electricity, for a policeman at sometime during that period gathered up the swinging end and placed it in a tree-box near by, so as to get it out of the way of persons passing along the street. The unbroken portion of the wire passed along for some distance into the city, but, further than to show there was no

contact with other wires for two squares, there was no evidence tending to prove that it received its deadly charge elsewhere than at the place where it crossed the feed wire. It is not contended that Nelson was guilty of contributory negligence. How he came in contact with the wire does not clearly appear. Some of the witnesses thought it was blown against him by the wind. However that may be, it passed between his fingers and as he recoiled from the shock he drew it about his neck and throat. He was badly burned; in a few days lockjaw set in and he died.

At the conclusion of the plaintiff's testimony the Court was asked by the defendants to instruct the jury that there was no legally sufficient evidence to show that the death of Nelson was caused by the negligence of the defendants, or either of them, and this the Court refused to do. To entitle the plaintiff to recover it was requisite that the proof should establish some duty on the part of the defendants in respect to the person injured, and that the injury was occasioned by reason of the failure of the defendants to perform that duty. This principle is stated in *Maenner* v. *Carroll*, 46 Md. 212, as follows: " To constitute a good cause of action, in a case of this nature, there should be stated a right on the part of the plaintiff, a duty on the part of the defendant in respect to that right and a breach of that duty by the defendant, whereby the plaintiff suffered injury." Now the deceased at the time of the injury was upon a public highway, at a spot where he had a right to be, and was going along it to his home in a lawful and proper manner. The sidewalks of the streets in a city are for the use of all persons who have occasion to pass along them, and Nelson, while in the exercise of this unquestioned right, was entitled to be protected and safe from all injury on account of dangerous obstructions. On the other hand, both of the defendants were using the streets under the permission of the State and municipal authorities, for purposes of private gain, by means of agencies such as could and would become dangerous to human life if not properly and carefully employed. The

Railway Company pursued its business by means of cars propelled by electricity, partially supplied through feed-wires over and along the edge of the pavement. The Telegraph Company had its poles also along the curb-line, and its wires extending along the street were over and along the feed-wire, which, though insulated, carried a deadly current. The privileges so granted, thus to encumber the public highway with appliances so likely to become dangerous to the public safety unless properly employed and controlled, imposed upon them, and each of them, the duty of so managing their affairs as not to injure persons lawfully on the streets. They owed it to Nelson that his lawful use of the street, should be substantially as safe as it was before the telegraph and railway plants had so occupied it. It was their plain duty, not only to properly erect their plants, but to maintain them in such condition as not to endanger the public. It follows from this, that if the property of the defendants was not in proper condition and by reason thereof Nelson was injured, these facts alone, in the absence of other evidence to show that the defect originated without the fault of the companies, afford a *prima facie* presumption of negligence. In such a case the doctrine of *"res ipsa loquitur"* ("a simple question of common sense," *Whittaker's Smith on Neg.* 423), fairly applies. In the leading case of *Kearney* v. *The London, &c., Railway Co.,* L. R. 5 Q. B. 411, affirmed in the Exchequer chamber, L. R. 6 Q. B. 759, and cited approvingly in *Howser's case*, 80 Md. 148, COCKBURN, C. J., said: "Where it is the duty of persons to do their best to keep premises or a structure in a proper condition, and we find it out of condition, and an accident happens therefrom, it is incumbent upon them to show that they used that reasonable care and diligence, which they were bound to use, and the absence of which, it seems to me, may fairly be presumed from the fact that there was the defect from which the accident has arisen." In *Byrne* v. *Boadle*, 2 Hurl. & Colt, 722, also cited in *Howser's case*, the plaintiff while walking in the street, was injured by a barrel falling

from an upper window of a warehouse belonging to the defendant, and on these facts alone, it was held, there was evidence of negligence to go to the jury.  In *Thomas* v. *W. U. T. Co.*, 100 Mass. 156, where two horses, driven along the highway, became entangled in a telegraph wire, swinging across a public way at such an height as to obstruct and endanger ordinary travel, it was held these facts alone, unexplained and unaccounted for, were evidence of neglect on the part of the company, and should have been submitted to the jury.  *Haynes* v. *Raleigh Gas Co.*, 19 S. E. Rep. 344; 114 N. C. 203; *Uggla* v. *West End St. Ry.*, 160 Mass. 353; 2 *Thompson on Neg.* 1220, *et seq.*; *Thompson on Electricity*, sec. 178; *S. W. Tel. Co.* v. *Robinson*, 50 Fed. Rep. 813; *Trans. Co.* v. *W. U. T. Co.*, 8 Benedicts Dist. C. (N. Y.) 502; *W. U. Tel. Co.* v. *Eyser*, 2 Col. 163; *Blanchard* v. *U. U. Tel. Co.*, 60 N. Y. 510; *Wolf* v. *Erie Tel. Co.*, 33 Fed. Rep. 322.

Was there evidence before the jury when these instructions were asked, from which they could find that the property of the defendants was out of proper condition at the time of the accident, and that by reason thereof Nelson was injured?  There was evidence that the telephone wire had been hanging over the feed-wire for at least two weeks; that in that position it was swayed by the wind, causing it to rub against the insulating material; that such rubbing for two weeks would cause a very serious damage to the insulation.  No information had been given to the jury, of any means by which the telephone wire was charged, otherwise than from the feed-wire; and that could have been possible only by defect in the insulation.  This was assuredly evidence tending to prove that the telephone wire was charged through the feed wire.  Whether sufficient or not, to establish it as a fact, was for the jury to determine.  It was within the province of the defendants to rebut the plaintiff's case in any manner they were able; to show that the insulation was perfect; or if that could not be done, that the defect was caused by circumstances over which

they had no control ; or that it existed for so short a time that they could not be reasonably expected to have been informed of it, and thereby have had an opportunity to mend it. To raise the presumption of negligence in this case, however it was not necessary for the plaintiff to negative all possible circumstances, which could excuse the defendants. If the jury were informed of but one point, where the telephone wire was in contact with a live wire, it would not be a wild speculation for them to infer in view of all the circumstances and in the absence of any evidence of contact elsewhere with the feed-wire, or with other live wires ; that that was the source from whence the electricity came, although it may have been a physical possibility that there might have been such contact with other wires further along the line. This, the defendants might have shown, if they could, by way of defence, but in the absence of all evidence on the point, the jury could infer without violence, that the electrical charge was in fact obtained by contact of the telephone wire with the feed-wire. We find no error in the rejection of the instructions set out in the third exception.

We deem it unnecessary to refer particularly to the action of the Court in granting or rejecting prayers in the case—what we have said is sufficient to dispose of them. We are of opinion the case was fairly put to the jury. Finding no error in the rulings of the Court, the judgment will be affirmed.

*Judgment affirmed.*

(Decided January 8th, 1896.)