962 A.2d 342

**Jane DOE, et al.**

v.

**MONTGOMERY COUNTY BOARD OF ELECTIONS.**

**No. 61 Sept.Term, 2008.**

Court of Appeals of Maryland.

Dec. 19, 2008.

698

**700**

Jonathan S. Shurberg (Jonathan S. Shurberg, P.C., Silver Spring, MD; Joseph S. Kakesh of Arnold & Porter, L.L.P., Washington, DC; Susan L. Sommer and Natalie M. Chinof, Lamda Legal Defense and Education Fund, Inc, New York City), all on brief, for Appellants/Cross-Appellees.

Brief of Public Justice Center, Casa De Maryland and Maryland Disability Law Center as Amici Curiae for Appellants/Cross-Appellees: Gregory P. Care, Francis D. Murnaghan, Jr., Appellate Advocacy Fellow, Baltimore, MD.

Kevin Karpinski (Victoria M. Shearer of Karpinski, Colaresi & Karp, P.A., Baltimore, MD), on brief, for Appellee/Cross-Appellant.

Brief of Amicus Curiae, Maryland Citizens for a Responsible Government Corp., Supporting Appellee/Cross-Appellant: John R. Garza, Rockville, MD Benjamin W. Bull, Brian W. Raum, Austin R. Nimocks, Amy Smith, Alliance Defense Fund, Scottsdale, AZ.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

BATTAGLIA, Judge.

The issue that presents itself in this case concerns whether the Montgomery County Board of Elections ("County Board") properly certified a petition for referendum proffered by the Maryland Citizens for Responsible Government ("Citizens Group") who sought to use the referendum process [1] to overturn Bill No. 23–07, enacted by the Montgomery County Council and signed by the County Executive, which would add "gender identity" as a protected characteristic under the County's anti-discrimination laws.[2] After the petition was

---

1. Generally, the ability of a citizen to seek referendum is provided by Section 1 of Article 16 of the Maryland Constitution, which states:
 (a) The people reserve to themselves power known as The Referendum, by petition to have submitted to the registered voters of the State, to approve or reject at the polls, any Act, or part of any Act of the General Assembly, if approved by the Governor, or, if passed by the General Assembly over the veto of the Governor;
 (b) The provisions of this Article shall be self-executing; provided that additional legislation in furtherance thereof and not in conflict therewith may be enacted.
 Section 8(a) of Article 25A of the Maryland Code (1957, 2005 Repl. Vol.), states that citizens of chartered counties may reserve to themselves the ability to petition for referendum of local laws:
 The citizens of a chartered county have the right to reserve to themselves the power of referendum by which they may, by petition, submit to the registered voters of the county any local law, or portion of any local law, enacted in accordance with the legislative procedure of the county council. If reserved, this right shall be set forth in the charter of the county which shall specify the types of local laws which may be petitioned to referendum and whether portions of laws may be petitioned to referendum.
 Section 114 of the Montgomery County Charter, in turn, provides for the referendum of legislation enacted by the Montgomery County Council:
 Any legislation enacted by the Council shall be submitted to a referendum of the voters upon petition of five percent of the registered voters of the County except legislation (1) appropriating money or imposing taxes, (2) prescribing Councilmanic districts, (3) authorizing the issuance of bonds or other financial obligations for a term of less than twelve months, and (4) authorizing obligations for public school sites, construction, remodeling, or public school buildings, whenever the total amount of such obligations authorized to be issued in any one year does not exceed one-fourth of one percent of the assessable base of the County.

2. The Bill defined "gender identity" as "an individual's actual or perceived gender, including a person's gender-related appearance, ex-

certified for the November 2008 election ballot, twelve Montgomery County citizens, Jane Doe et al., ("Jane Doe") challenged the validity of the petition by filing, in the Circuit Court for Montgomery County, a Complaint for Judicial Review and Declaratory Judgment[3] under Section 6–209 of the Election Law Article, Maryland Code (2003, 2007 Supp.).[4] Both parties subsequently filed cross-motions for summary judgment, and the judge entered summary judgment on behalf of the County Board,[5] holding that, although the number

---

pression, image, identity, or behavior, whether or not those gender-related characteristics differ from the characteristics customarily associated with the person's assigned sex at birth," and added the term to various Sections of the Montgomery County Code, including Section 8A–15, 27–1, 27–5, 27–6, 27–1 1, 27–12, 27–16, 27–19, 27–22 and 53–313, which are collectively aimed at "prohibit[ing] discrimination in housing, employment, public accommodations, cable television service, and taxicab service on the basis of gender identity."

**3.** They sought declaratory relief pursuant to Sections 3–401 *et seq.* of the Maryland Courts and Judicial Proceedings Article, Maryland Code (1974, 2006 Repl.Vol.), as authorized by Section 6–209(b) of the Election Law Article, Maryland Code (2003, 2007 Supp.).

Statutory references throughout are to the Election Law Article, Maryland Code (2003, 2007 Supp.), unless otherwise noted.

**4.** Section 6–209, provides for judicial review of Board of Elections decisions:

(a) *In general.*—(1) A person aggrieved by a determination made under § 6–202, § 6–206, or § 6–208(a)(2) of this subtitle may seek judicial review:

(i) in the case of a statewide petition, a petition to refer an enactment of the General Assembly pursuant to Article XVI of the Maryland Constitution, or a petition for a congressional or General Assembly candidacy, in the Circuit Court for Anne Arundel County; or

(ii) as to any other petition, in the circuit court for the county in which the petition is filed.

(2) The court may grant relief as it considers appropriate to assure the integrity of the electoral process.

(3) Judicial review shall be expedited by each court that hears the cause to the extent necessary in consideration of the deadlines established by law.

(b) *Declaration relief.*—Pursuant to the Maryland Uniform Declaratory Judgments Act and upon the complaint of any registered voter, the circuit court of the county in which a petition has been or will be filed may grant declaratory relief as to any petition with respect to the provisions of this title or other provisions of law.

**5.** Jane Doe subsequently filed a notice of appeal from the judgment of

of signatures on the petition did not amount to the requisite 5% of registered voters, Jane Doe's complaint to remove the referendum from the ballot failed to properly raise the issue because it was time-barred, having been filed after the 10–day limitations period contained in Section 6–210(e).[6] We granted cross-petitions for certiorari to answer the following questions, the first two presented by Jane Doe and the third by the Board:

1. Did the Circuit Court err in ruling that a voter challenge to certification of a referendum petition that failed to carry the required number of signatures, which challenge was filed within ten days of the certification, is nonetheless partially time-barred?

2. Did the Circuit Court err in ruling, contrary to the strict compliance standard dictated by this Court in an unbroken line of decisions, that specific signature requirements prescribed under the election laws for referenda petitions need not be met, with the result that a referendum petition carrying an insufficient number of valid signatures was certified for the ballot?

3. [Did] the Circuit Court err[ ] in holding that the Board is required to include inactive voters in calculating the total number of registered voters in Montgomery County and, thus, in calculating 5% of that number to determine the number of signatures required on the petition for referendum[?]

---

the Circuit Court and the County Board filed a notice of cross-appeal.

**6.** Section 6–210(e) requires parties instituting a cause of action under 6–209 to file their complaint within 10 days following the determination to which the suit relates.

(e) *Judicial Review.*—(1) Except as provided in paragraph (2) of this subsection, any judicial review of a determination, as provided in § 6–209 of this subtitle, shall be sought by the 10th day following the determination to which it relates.

(2) If the petition seeks to place the name of an individual or a question on the ballot at any election, judicial review shall be sought by the day specified in paragraph (1) of this subsection or the 63rd day preceding that election, whichever day is earlier.

## I. Introduction

On November 21, 2007, Montgomery County Executive Isiah Leggett signed into law Bill No. 23–07, enacted by the Montgomery County Council, which prohibited discrimination based on "gender identity" under the County's anti-discrimination statutes. The Citizens Group opposed to the enactment of the "gender identity" bill initiated the process of obtaining the signatures of 5% of the registered voters in the County to petition the law to referendum.[7] The petition stated:

We, the undersigned registered voters of Montgomery County, Maryland, do hereby petition for a referendum vote of the registered voters of the County for approval or rejection in the next general election on Bill 23–07, Non–Discrimination—Gender Identity, entitled: "An Act to prohibit discrimination in housing, employment, public accommodation, cable television service, and taxicab service on the basis of gender identity; and generally to amend County laws regarding discrimination", enacted on November 13, 2007 by the County Council for Montgomery County, Maryland.

The County Board's Director, Margaret Jurgensen, emailed Ruth M. Jacobs, President of the Citizens Group, on November 30, 2007 to inform her that the petition would require 25,001 [8] signatures of Montgomery County registered voters,

---

7. Under Section 115 of Article 1 of the Montgomery County Code, at least 50% of the required signatures must be filed within 75 days following the date that the legislation becomes law and the remaining 50% of the required signatures must be filed 15 days later, or 90 days following the date that the legislation becomes law.

8. This number corresponds to 5% of the 500,012 "active" voters in Montgomery County. Were the 52,269 "inactive" voters, or those voters who had failed to respond to a confirmation of address notice, see Section 3–503(a), included as registered voters, 27,615 signatures of registered voters would have been required. During the course of this litigation, Jane Doe and the County Board stipulated that there were 52,269 "inactive" voters in Montgomery County on November 30, 2007, the date nearest to the date the 500,012 registered voter figure was

with 50% due by February 4, 2008 and the other 50% due by February 19, 2008. Letters from the County Board's attorney approving the form of the petition as well as an internet version of the form, were sent to the Citizens Group on December 3, 2007, and December 7, 2007, respectively.

The Citizens Group submitted 15,146 petition signatures to the County Board on February 4, 2008. On February 19, 2008, the Citizens Group submitted 15,506 more signatures, and the next day, February 20, 2008, the Director of the County Board sent a letter to the President of the Citizens Group formally notifying her that of the 15,146 signatures submitted on February 4, 13,476 were "valid, accepted signatures." On March 6, 2008, the County Board sent a letter to the Montgomery County Executive and the President of the Montgomery County Council, among others, certifying the petition and stating that the "petition contained more than the requisite number of signatures necessary to place the question on the 2008 General Election ballot" and "that the petition appears to meet the necessary requirements" regarding content under Section 6–201.[9]

---

provided to the Citizens Group for which figures were available in the State database.

9. Section 6–201 provides:

(a) *In General.*—A petition shall contain:
(1) an information page; and
(2) signature pages containing not less than the total number of signatures required by law to be filed.
(b) *Information page.*—The information page shall contain:
(1) a description of the subject and purpose of the petition, conforming to the requirements of regulations;
(2) identification of the sponsor and, if the sponsor is an organization, of the individual designated to receive notices under this subtitle;
(3) the required information relating to the signatures contained in the petition;
(4) the required affidavit made and executed by the sponsor or, if the sponsor is an organization, by an individual responsible to and designated by the organization; and
(5) any other information required by regulation.
(c) *Signature page.*—Each signature page shall contain:

After the petition was certified by the County Board on March 6, 2008, eight days later, on March 14, 2008, twelve Montgomery County citizens, Jane Doe, et al., filed a complaint pursuant to Section 6–209, seeking judicial review and declaratory relief in the Circuit Court of Montgomery County. The complaint alleged, among other arguments, that the County Board "certified the Petition despite the Petition's failure to include, by the legal deadlines, the requisite number of valid signatures required for certification." The County Board answered and then moved for summary judgment, arguing that Jane Doe's complaint was time-barred because it was not filed within the 10–day period prescribed by Section 6–210, and that even if it was timely filed, Jane Doe did not present a legal basis for challenging the County Board's

---

(1) a description of the subject and purpose of the petition, conforming to the requirements of regulations;

(2) if the petition seeks to place a question on the ballot, either:

(i) a fair and accurate summary of the substantive provisions of the proposal; or

(ii) the full text of the proposal;

(3) a statement, to which each signer subscribes, that:

(i) the signer supports the purpose of that petition process; and

(ii) based on the signer's information and belief, the signer is a registered voter in the county specified on the page and is eligible to have his or her signature counted;

(4) spaces for signatures and the required information relating to the signers;

(5) a space for the name of the county in which each of the signers of that page is a registered voter;

(6) a space for the required affidavit made and executed by the circulator; and

(7) any other information required by regulation.

(d) *Petition relating to questions.*—If the petition seeks to place a question on the ballot and the sponsor elects to print a summary of the proposal on each signature page as provided in subsection (c)(2)(i) of this section:

(1) the circulator shall have the full text of the proposal present at the time and place that each signature is affixed to the page; and

(2) the signature page shall state that the full text is available from the circulator.

(e) *Signature page to meet requirements at all times.*—A signature page shall satisfy the requirements of subsections (c) and (d)(2) of this section before any signature is affixed to it and at all relevant times thereafter.

decision to certify the ballot. Jane Doe filed a cross-motion for summary judgment, contending that the petition should be decertified because thousands of purported signatures were invalid and because the petition itself was defective. During the hearing on the summary judgment motions, counsel for the County Board revealed, for the first time, that "inactive" voters were not included in the total number of registered county voters from which the Board derived the 5% figure, and based on this new information, Jane Doe moved for leave to amend the complaint. The Circuit Court granted the motion, stating in a later order that it believed that the "new theory [wa]s based upon the same core of operative facts originally pled by Plaintiffs"; an amended complaint was filed on July 8, 2008. The County Board did not file a motion to strike or a motion for reconsideration of the trial court's order granting leave to amend, and the case proceeded on the basis of the amended complaint.

After the completion of oral argument on the motions for summary judgment, the judge granted the County Board's motion for summary judgment, denied Jane Doe's cross-motion and in his Memorandum Decision and Declaratory Judgment Order, dismissed the amended complaint because he determined that the 6–209 cause of action for judicial review and declaratory relief accrued on February 20, when the County Board had sent the Citizens Group a letter stating that 13,476 signatures of the 15,146 purported signatures submitted on February 4 were "valid [and] accepted," so that the complaint was filed beyond the limitations period; the judge also explored the various bases for invalidating the petition and held that the challenged signatures were valid, but insufficient.

In addressing the sufficiency of the challenged signatures, the court determined that "inactive" voters should have been included as registered voters, having declined to accept the County Board's argument that doing so "would artificially inflate the number of signatures required to successfully petition for referendum." The court also considered whether the signatures on the referendum petition were required to com-

ply with the provisions of Section 6–203.[10] On this issue the parties stipulated that 5,141 signatures included in the February 4 submission and 5,735 signatures of the February 19 submission failed to mirror the voter's identity on the statewide voter registration list. The court determined that the signature provisions of Section 6–203 were merely suggestive as opposed to required and validated the 10,876 challenged

---

**10.** Section 6–203 pertains to information provided by signers and states, in pertinent part:

(a) *In general.*—To sign a petition, an individual shall:
(1) sign the individual's name as it appears on the statewide voter registration list or the individual's surname of registration and at least one full given name and the initials of any other names; and
(2) include the following information, printed or typed, in the spaces provided:
(i) the signer's name as it was signed;
(ii) the signer's address;
(iii) the date of signing; and
(iv) other information required by regulations adopted by the State Board.
(b) *Validation and counting.*—The signature of an individual shall be validated and counted if:
(1) the requirements of subsection (a) of this section have been satisfied;
(2) the individual is a registered voter assigned to the county specified on the signature page and, if applicable, in a particular geographic area of the county;
(3) the individual has not previously signed the same petition;
(4) the signature is attested by an affidavit appearing on the page on which the signature appears;
(5) the date accompanying the signature is not later than the date of the affidavit on the page; and
(6) if applicable, the signature was affixed within the requisite period of time, as specified by law.
In addressing the issue of signature defects, the court classified defects into six general categories, with the most challenged signatures in the category of those signatures not conforming with the provisions set forth in Section 6–203. The other five categories of defects discussed by the court include alleged violations based upon the circulator executing an affidavit for his or her own signature, the circulator's affidavit predating the voter's signature, as well as violations for affixing signatures to a non-standard petition page, affixing signatures to pages where there are signs of possible fraud or other irregularities by the signer or circulator and miscellaneous problems. We shall only discuss the allegation that the signatures failed to comply with Section 6–203, because this is the sole category of signature defects challenged.

signatures.[11]

Jane Doe petitioned for certiorari as well as for expedited review, and the County Board cross-petitioned; we granted both petitions. *Doe v. Board of Elections,* 405 Md. 505, 954 A.2d 467 (2008). Oral argument was heard on September 8, 2008, and the next day, on September 9, 2008, we issued our Per Curiam Order reversing the judgment of the Circuit Court and remanding the case to that court with directions to enter judgment in favor of Jane Doe.[12] *Doe v. Montgomery County Board of Elections,* 406 Md. 110, 111, 956 A.2d 199, 200 (2008). We shall now set forth our reasons for that Order.

## II. Discussion

■ In the case *sub judice,* we are asked to consider two questions: whether Jane Doe filed a timely complaint for judicial review and declaratory relief contesting the Board's certification of the referendum petition for the November 2008 ballot; and then, if the suit is not time-barred, whether the referendum contained a sufficient number of valid signatures to reach 5% of Montgomery County registered voters, as required by Section 114 of the Montgomery County Charter. Because we shall hold that the complaint was not time-barred, we shall address the merits of the referendum challenge.

---

11. One such signature was the signature of a voter who identified herself as only "Katie." The Board and the Circuit Court accepted the signature, finding that it complied with Section 6–203, because a "Katie M. Toth" was in the voter registration records at the same address.

12. The Order stated:
 For reasons to be stated in an opinion later to be filed, it is this 9th day of September, 2008,
 ORDERED, by the Court of Appeals of Maryland, a majority of the Court concurring, that the judgment of the Circuit Court for Montgomery County be, and it is hereby, reversed, and the matter remanded to the Circuit Court with directions to enter judgment in favor of Appellants. Costs to be paid by the Appellee. Mandate to issue forthwith.
 *Doe v. Montgomery County Board of Elections,* 406 Md. 110, 111, 956 A.2d 199, 200 (2008).

 The parties before us had filed cross-motions for summary judgment. The trial judge granted summary judgment in favor of the County Board and denied Jane Doe's Cross–Motion for Summary Judgment.[13] In considering a trial court's grant of a motion for summary judgment, this Court reviews the record in the light most favorable to the non-moving party. *Bednar v. Provident Bank of Maryland, Inc.*, 402 Md. 532, 542, 937 A.2d 210, 215 (2007); *Rhoads v. Sommer*, 401 Md. 131, 148, 931 A.2d 508, 518 (2007) ("We review the record in the light most favorable to the non-moving party and construe any reasonable inferences that may be drawn from the facts against the moving party."); *Harford County v. Saks Fifth Ave. Distribution Co.*, 399 Md. 73, 82, 923 A.2d 1, 6 (2007) (In reviewing a trial court's decision on a motion for summary judgment, "we seek to determine whether any material facts are in dispute and, if they are, we resolve them in favor of the non-moving party."); *Serio v. Baltimore County*, 384 Md. 373, 388–89, 863 A.2d 952, 961 (2004); *Lovelace v. Anderson*, 366 Md. 690, 695, 785 A.2d 726, 728 (2001) (In reviewing a grant of the defendants' motions for summary judgment, "we must review the facts, and all inferences therefrom, in the light most favorable to the plaintiffs."). If no material facts are placed in genuine dispute, this Court must determine whether the Circuit Court correctly entered summary judgment as a matter of law. *See* Maryland Rule 2–501(f);[14] *Bednar*, 402 Md. at 532, 937 A.2d at 216; *Saks*, 399 Md. at 82, 923 A.2d at 6; *Prop. and Cas. Ins. Guar. Corp. v. Yanni*, 397 Md. 474, 480, 919 A.2d 1, 5 (2007); *Standard Fire Ins. Co. v. Berrett*, 395 Md. 439, 451, 910 A.2d 1072, 1079 (2006); *Ross v. State Bd. of Elections*, 387 Md. 649, 659, 876

---

**13.** We need not address the Circuit Court's denial of Jane Doe's Cross–Motion for Summary Judgment.

**14.** Maryland Rule 2–501(f) states in part: The court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law.

A.2d 692, 698 (2005). In the case before us, there are no material facts in dispute.

Here, we are also faced with the interpretation of four sections of the Election Law Article, Sections 3–503, 6–203, 6–209 and 6–210. In statutory interpretation, our primary goal is always "to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision, be it statutory, constitutional or part of the Rules." *Barbre v. Pope*, 402 Md. 157, 172, 935 A.2d 699, 708 (2007); *Gen. Motors Corp. v. Seay*, 388 Md. 341, 352, 879 A.2d 1049, 1055 (2005). *See also Dep't of Health & Mental Hygiene v. Kelly*, 397 Md. 399, 419–20, 918 A.2d 470, 482 (2007). We begin our analysis by first looking to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that " 'no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.' " *Barbre*, 402 Md. at 172, 935 A.2d at 708; *Kelly*, 397 Md. at 420, 918 A.2d at 482. *See also Kane v. Bd. of Appeals of Prince George's County*, 390 Md. 145, 167, 887 A.2d 1060, 1073 (2005). If the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions and our analysis ends. *Barbre*, 402 Md. at 173, 935 A.2d at 708–09; *Kelly*, 397 Md. at 419, 918 A.2d at 482; *City of Frederick v. Pickett*, 392 Md. 411, 427, 897 A.2d 228, 237 (2006); *Davis v. Slater*, 383 Md. 599, 604–05, 861 A.2d 78, 81 (2004). If, however, the language is subject to more than one interpretation, it is ambiguous, and we endeavor to resolve that ambiguity by looking to the statute's legislative history, case law, statutory purpose, as well as the structure of the statute. *Barbre*, 402 Md. at 173, 935 A.2d at 709; *Kelly*, 397 Md. at 419–20, 918 A.2d at 482; *Smack v. Dep't of Health & Mental Hygiene*, 378 Md. 298, 305, 835 A.2d 1175, 1179 (2003). When the statute is part of a larger statutory scheme, it is axiomatic that the language of a provision is not interpreted in isolation; rather, we analyze the statutory scheme as a whole considering the "purpose, aim, or policy of the enacting body," *Serio v. Baltimore County*, 384 Md. 373, 390, 863 A.2d at 952, 962 (2004); *Drew v. First Guar. Mortgage Corp.*, 379 Md. 318,

327, 842 A.2d 1, 6 (2003), and attempt to harmonize provisions dealing with the same subject so that each may be given effect. *Bowen v. City of Annapolis,* 402 Md. 587, 613–14, 937 A.2d 242, 258 (2007); *Magnetti v. Univ. of Md.,* 402 Md. 548, 565, 937 A.2d 219, 229 (2007); *Clipper Windpower, Inc. v. Sprenger,* 399 Md. 539, 554, 924 A.2d 1160, 1168 (2007).

### A.

### *Accrual of the 6–209 Cause of Action*

■ The first question before us is whether Jane Doe's March 14, 2008, complaint, seeking judicial review of and declaratory relief from the County Board's March 6, 2008 determination to certify the referendum for ballot under Section 6–209 [15] is time-barred under the dictates of Section 6–210(e), which states that "any judicial review of a determination, as provided in § 6–209 of this subtitle, shall be sought by the 10th day following the determination to which it relates." We assume, *without having to decide* that the 10–day period applies, because we shall hold that the "determination," which caused Jane Doe to become aggrieved and thereby triggered Doe's cause of action for judicial review, accrued on March 6, 2008, when the County Board made a final determination, certifying the petition in a letter to the County Executive and the President of the Montgomery County Council stating that "the petition contained more than the requisite number of signatures necessary to place the question on the 2008 General Election ballot" and "that the petition appears to meet the necessary requirements."

The County Board argues that the cause of action accrued prior to March 6, 2008, because each of the County Board's letters to the Citizens group constituted "determinations" under Section 6–209 and, therefore, Doe's cause of action accrued on November 30, 2007, when the County Board emailed the Citizens Group informing them that 5% of regis-

---

**15.** The complaint specifically asks for judicial review under Section 6–209(a) and for declaratory judgment under Section 6–209(b).

tered Montgomery County voters was 25,001; in December of 2007, when the County Board informed the Citizens group that it had made an advance determination of the sufficiency of the form petition; or on February 20, 2008, when the County Board informed the Citizens Group that 13,476 of the signatures submitted February 4 were "valid [and] accepted," so that Doe waived her ability to challenge the March 6 determination by failing to challenge these previous determinations. The Circuit Court, in granting the County Board's Motion for Summary Judgment, agreed that February 20, when half of the signatures were accepted as valid, was the relevant "determination" to trigger the Section 6–210(e), 10–day limitation period.

■ Jane Doe argues, on the other hand, that the 10–day limitations period does not apply, and, even if it applied, that she complied with the limitations period because the complaint was filed on March 14, which was within 10–days of March 6, when the County Board made a final determination that all of the necessary signatures had been gathered and certified the referendum question for the November 2008 ballot. Jane Doe argues that she was not "aggrieved" before the March 6 determination of the County Board, and that therefore, she could not have sought judicial review before that date.[16]

Section 6–210(e) establishes a 10–day period within which an aggrieved person must seek judicial review of a determination under Section 6–209:

(e) *Judicial review.*—(1) Except as provided in paragraph (2) of this subsection, any judicial review of a determination,

---

16. Because we hold that the cause of action accrued on March 6, 2008, we need not address either party's arguments concerning when the cause of action was discovered nor must we discuss the application of the laches doctrine. Finally, because "[t]his Court has regularly adhered to the principle that we will not reach a constitutional issue when a case can properly be disposed of on a non-constitutional ground," we shall not address any of the constitutional arguments. *See Professional Staff Nurses Ass'n v. Dimensions Health Corp.,* 346 Md. 132, 695 A.2d 158 (1997); *State v. Lancaster,* 332 Md. 385, 404 n. 13, 631 A.2d 453, 463 n. 13 (1993).

as provided in § 6–209 of this subtitle, shall be sought by the 10th day following the determination to which it relates.

For the purposes of this analysis, we assume, without deciding, that this 10–day period applies and must interpret Section 6–209 to analyze when the cause of action for judicial review accrued.

■ Section 6–209(a), entitled *"In general,"* governs when a plaintiff may seek judicial review of an election board determination and provides for relief to be afforded by the court, "as it considers appropriate":

### § 6–209. Judicial review.

(a) *In general.*—(1) A person aggrieved by a determination made under § 6–202, § 6–206, or § 6–208(a)(2) of this subtitle may seek judicial review:

(i) in the case of a statewide petition, a petition to refer an enactment of the General Assembly pursuant to Article XVI of the Maryland Constitution, or a petition for a congressional or General Assembly candidacy, in the Circuit Court for Anne Arundel County; or

(ii) as to any other petition, in the circuit court for the county in which the petition is filed.

(2) The court may grant relief as it considers appropriate to assure the integrity of the electoral process.

(3) Judicial review shall be expedited by each court that hears the cause to the extent necessary in consideration of the deadlines established by law.

Although, then, one who is aggrieved may seek any type of appropriate relief, such as injunctive, declaratory or another type, under subsection 6–209(b), a voter who seeks judicial review is limited to declaratory relief:

(b) *Declaration relief.*—Pursuant to the Maryland Uniform Declaratory Judgments Act and upon the complaint of any registered voter, the circuit court of the county in which a petition has been or will be filed may grant declaratory relief as to any petition with respect to the provisions of this title or other provisions of law.

Under the scheme, therefore, a registered voter may bring the action for judicial review, i.e. become a plaintiff, when a determination is made that results in aggrievement.

We have had numerous occasions to define "aggrieved" in the context of judicial review of an administrative agency determination. In *Sugarloaf Citizens' Association v. Department of Environment*, 344 Md. 271, 288, 686 A.2d 605, 614 (1996), Judge John C. Eldridge, speaking for the Court, reflected upon our jurisprudence when he stated:

> While the term "aggrieved" is not defined in the Administrative Procedure Act, we have held that the statutory requirement that a party be " 'aggrieved' mirrors general common law standing principles applicable to judicial review of administrative decisions." *Medical Waste [Associates, Inc.] v. Maryland Waste [Coalition, Inc.], supra,* 327 Md. [596] at 611 n. 9, 612 A.2d [241] at 248–249 n. 9; *Bryniarski v. Montgomery Co.,* 247 Md. 137, 143–146, 230 A.2d 289, 294–295 (1967). Accordingly, in order to be "aggrieved" for purposes of judicial review, a person ordinarily must have an interest " 'such that he is personally and specifically affected in a way different from . . . the public generally.' " *Medical Waste v. Maryland Waste, supra,* 327 Md. at 611 n. 9, 612 A.2d at 248–249 n. 9, quoting *Bryniarski v. Montgomery Co., supra,* 247 Md. at 144, 230 A.2d at 294. *See Maryland–Nat'l Capital Park & Planning Com'n v. Smith, supra,* 333 Md. [3] at 11, 633 A.2d [855] at 859; *Abramson v. Montgomery County,* 328 Md. 721, 733, 616 A.2d 894, 900 (1992); *DuBay v. Crane,* 240 Md. 180, 185, 213 A.2d 487, 489–490 (1965) ("the [administrative] decision must not only affect a matter in which the protestant has a specific interest or property right but his interest therein must be such that he is personally and specially affected in a way different from . . . the public generally").

(Ellipses in original). *See also Jordan Towing, Inc. v. Hebbville Auto Repair, Inc.,* 369 Md. 439, 442, 800 A.2d 768, 770 (2002) ("A party is aggrieved and there is standing if the party suffers some 'special damage . . . differing in character and

kind from that suffered by the general public.'") (ellipsis in original).

Moreover, Judge Eldridge, in *State v. Maryland State Board of Contract Appeals*, 364 Md. 446, 457, 773 A.2d 504, 510–11 (2001), explained that an administrative determination must be final before judicial review is invoked:

> Where an administrative agency has primary or exclusive jurisdiction over a controversy, the parties to the controversy must ordinarily await a final administrative decision before resorting to the courts for resolution of the controversy. *Board of License Commissioners v. Corridor Wine, supra*, 361 Md. at 418, 761 A.2d at 924, and cases there cited. *See also Furnitureland South, Inc. v. Comptroller*, 364 Md. 126, 771 A.2d 1061 (2001). Furthermore, in *Driggs Corp. v. Md. Aviation*, 348 Md. 389, 406–408, 704 A.2d 433, 442–443 (1998), we held that the Board of Contract Appeals has either primary or exclusive jurisdiction over government contract matters encompassed by § 15–211 of the State Finance and Procurement Article and that, consequently, any judicial resolution of the matter, before a final decision by the Board of Contract Appeals, would be premature.

(Footnote omitted). *See also Board of License Comm'rs for Anne Arundel County v. Corridor Wine, Inc.*, 361 Md. 403, 418, 761 A.2d 916, 924 (2000) ("It is a general principle of Maryland Administrative law that an action for judicial review of an administrative order will lie only if the administrative order is final.") (Internal quotations omitted). Judge Glenn T. Harrell, speaking on behalf of this Court in *Heery International, Inc. v. Montgomery County*, 384 Md. 129, 137, 862 A.2d 976, 981 (2004), also iterated the general rule, requiring a final determination before an aggrieved party, a potential plaintiff, can seek judicial review of an agency decision:

> We have long held that "[w]here an administrative agency has primary or exclusive jurisdiction over a controversy, the parties to the controversy must ordinarily await a final administrative decision before resorting to the courts for resolution of the controversy."

In the present case, the Circuit Court Judge relied upon *Roskelly v. Lamone*, 396 Md. 27, 912 A.2d 658 (2006), to decide that Jane Doe should have initiated a judicial review action of the February 20 Board determination that half of the signatures were valid, even though another half was still necessary to certify the petition for the November ballot, stating that *"Roskelly* mandates that where referendum petitioners are aggrieved by a rejection of signatures at the first step of the signature-gathering process, they are required to seek judicial review within 10 days of the determination." We disagree.

In *Roskelly* the sponsor of the petition did not file for judicial review of a June 8 determination of the Board of Elections, which stated that Roskelly's petition was deficient, so his challenge 19 days later was time-barred. Clearly, Roskelly, as the petition sponsor, was "aggrieved" on June 8 when a final determination denying certification was made.

Here, Jane Doe was not "aggrieved" by the actions of the County Board in letters sent on November 30, December 3 and 7, or February 20, nor were these actions "final." On November 30, 2007, the County Board merely informed the Citizens Group of the necessary number of valid signatures to place the referendum on the ballot. On December 3 and 7, 2007, the County Board sent a letter to the Citizens Group, stating that the paper and internet forms of the Citizens Group's petition were valid. On February 20, 2008, the County Board determined that the Citizens Group had submitted over 50% of the signatures, but needed 11,534 more to be submitted before the referendum could be successfully certified and placed on the November ballot. Rather, not until March 6, 2008, when the County Board certified that the Citizens Group had met the statutory requirements to put the referendum question on the November 2008 ballot, was Jane Doe "aggrieved" by a final "determination" of the County Board and capable of seeking judicial review under Section 6–209. Accordingly, March 6, 2008, was the triggering date for when Jane Doe's cause of action for judicial review accrued, and the complaint filed on March 14 was timely.

### Amended Complaint

■ We next address the effect that the amended pleading had on the original complaint. The County Board argues that Jane Doe failed to challenge the determination regarding the number of registered voters within ten days of March 6, 2008, because the amended complaint, filed July 8, 2008, which more specifically addressed the issue of "inactive" voters, "added a new theory or cause of action and, thus, does not relate back to the filing of the original complaint." Doe counters that paragraph 51 on the original complaint, which pled that the "[d]efendant BOARD OF ELECTIONS certified the Petition despite the Petition's failure to include, by the legal deadlines, the requisite number of valid signatures required for certification," adequately stated the factual basis for the cause of action for judicial review and declaratory relief, and that the later amended complaint merely added greater specificity to this assertion. Leave to amend the complaint was granted, nevertheless, because the trial judge determined that the "new theory is based upon the same core of operative facts originally pled by Plaintiffs, and that amendment [would] facilitate a determination based on the true issues of the litigations and [would avoid] an injustice by reasons of a procedural technicality." The County Board, furthermore, filed no motion challenging the trial court's grant of leave to amend because the amended complaint originated from the same core of operative facts, and the summary judgment process proceeded on the basis of the amended complaint.

In *Morrell v. Williams,* 279 Md. 497, 506, 366 A.2d 1040, 1044 (1976), we explained the relation-back principle, iterating that "an amended [complaint] filed after the expiration of a statute of limitations will be barred, if [it] states a new cause of action or a new theory of liability." *See also Eastern Air Lines, Inc. v. Phoenix Sav. & Loan Ass'n,* 239 Md. 195, 201, 210 A.2d 515, 518 (1965); *Cline v. Fountain Rock Lime & Brick Co.,* 214 Md. 251, 258, 134 A.2d 304, 308 (1957); *Schuck v. Bramble,* 122 Md. 411, 413, 89 A. 719, 720 (1914); Paul Mark Sandler & James K. Archibald, Pleading Causes of Action in Maryland 38–39 (4th ed. 2008). We also have held,

on numerous other occasions, that when the amendment does not state a new cause of action or theory of liability, it will relate back to the filing of the original. *See, e.g., Crowe v. Houseworth,* 272 Md. 481, 489–90, 325 A.2d 592, 597 (1974) (amendment, which added other joint tenants as parties, related back to original trespass action); *Doughty v. Prettyman,* 219 Md. 83, 93, 148 A.2d 438, 443 (1959) (amendments related back because they stated same operational facts and did not introduce a new theory of liability but merely spelled out in detail the basis of the alleged liability); *State ex rel. Cavanaugh v. Arundel Park Corp.,* 218 Md. 484, 489, 147 A.2d 427, 429–30 (1959) (amendments that "spell[ed] out in detail the basis of the alleged liability" was a different statement of the same cause of action based on negligence and thus related back); *Brooks v. Childress,* 198 Md. 1, 14, 81 A.2d 47, 54 (1951) (amendment related back where original declaration was predicated upon father's responsibility for the negligence of his son based on agency principals and the amendment imputed negligence to the father by virtue of his consent in signing his son's application for a driver's license); *Western Union Tel. Co. v. State ex rel. Nelson,* 82 Md. 293, 306, 33 A. 763, 764 (1896) (amendment that corrected the name of one of two corporate defendants was not the equivalent of a new suit).

The conceptual framework of the relation-back concept was articulated by Chief Judge James McSherry in *State ex rel Zier v. Chesapeake Beach Railway Co.,* 98 Md. 35, 40–41, 56 A. 385, 387 (1903) (hereinafter *"Zier"*):

The institution of a suit arrests the running of the Statute of Limitations, and the general rule is that, where the period of limitations has not elapsed before the suit was brought, a mere amendment of the declaration, *when the cause of action remains the same,* will not warrant the filing of a plea of limitations, even though the statutory period has intervened between the time when the cause of action accrued and the date of making the amendment. The reason for this rule is that the bringing of the suit stops the running of the statute and consequently, so long as the suit

proceeds for the *same* cause of action, the bar of the statute cannot attach. When, however, by amendment, the *cause of action* is changed, a new suit is begun when the amendment is made, and if between the accruing of *that* cause of action and the date of the amendment, which *for the first time* invokes that cause of action, the period of limitations has supervened, then the plea may be interposed to that *new* suit.

(Emphasis in original). *See also State ex rel. Cavanaugh,* 218 Md. at 490, 147 A.2d at 430 ("The amendment supplying that allegation was not the statement of a new or different cause of action, but the statement of the same cause of action, with an amendment to spell out in detail the basis of the alleged liability."); *Lichtenberg v. Joyce,* 183 Md. 689, 697, 39 A.2d 789, 793 (1944) ("The period of limitation must elapse prior to the date of the filing of the suit, unless the cause of action is changed.").

In *Zier,* the wife of Charles Zier, initiated a wrongful death action against her husband's employer when he was terminally injured by a train collision. Zier died on July 2, 1900, and the wife's suit was brought on January 3, 1901, with an amendment filed on April 17, 1902, past the one-year limitation period for a wrongful death action. The lower court dismissed the entire Complaint, holding that it was barred by the one-year statute of limitations. We reinstated the Complaint, holding that the addition of the employer's negligence in the amendment did not recite a new cause of action for wrongful-death and therefore related-back to the original:

The *statement* of the cause of action was different, but the *cause of action* itself was identical. Injury resulting in death is what occasioned the suit. The imperfect statement of the case did not cause the correct statement to be a different cause of action. Being the *same* cause of action, the accurate statement of it in the amended declaration did not convert the original suit into a new and different suit; and therefore did not warrant the filing of any other plea of

the Statute of Limitations than such as could have been interposed to the original. . . .

*Zier,* 98 Md. at 42–43, 56 A. at 387–88 (emphasis in original).

In the instant case, Jane Doe specifically averred in Paragraph 51 of her Complaint that the Board "certified the Petition despite the Petition's failure to include, by the legal deadlines, the requisite number of valid signatures required for certification," in support of her cause of action for judicial review. The Complaint was then amended in July to allege, based upon the recently revealed information proffered by the attorney for the County Board, that "inactive" voters had not been included in the total number of registered voters, so that the requisite number of valid signatures had not been included. Clearly, as in *Zier,* "[t]he *statement* of the cause of action was different, but the *cause of action* itself was identical," for Doe's amended complaint did not "convert the original suit into a new and different suit" (emphasis in original).

## B.

Because we hold that Jane Doe's complaint was timely, we now turn to whether the percentage of registered voters included only "active" voters or the combined total of "active" plus "inactive" voters. According to Section 3–503(a),[17] an "inactive" voter is one who has been placed on "inactive" status for failing to respond to a confirmation of address notice;[18] Jane Doe asserts that "inactive" voters should have

---

**17.** Section 3–503(a) provides:

(a) *In general.*—If a voter fails to respond to a confirmation notice under § 3–502(c) of this subtitle, the voter's name shall be placed into inactive status on the statewide voter registration list.

**18.** The "inactive list" is used to remove those who have moved out of the State or are deceased from the statewide voter registration list. Under Sections 3–503(c), "[a]n inactive voter who fails to vote in an election in the period ending with the second general election shall be removed from the statewide voter registration list." A voter is restored to "active" status, under the dictates of 3–503(b), "after completing and signing any of the following election documents:"

(1) a voter registration application;

been combined with the number of "active" voters to constitute the total number of registered voters upon which the 5% requisite number of signatures would be based. Essentially, Jane Doe asserts that the denominator of the equation, or the total number of *registered voters*, means a combination of "active" and "inactive" voters, while the numerator of the equation would represent the number of registered voters constituting 5% of the total. The County Board, conversely, argues that "inactive" voters should not be included in the denominator, because doing so would artificially inflate the number of signatures required to place the referendum on the ballot and also that for the purposes of determining the number of people supporting a referendum, an "inactive" voter becomes an "active" one merely by affixing a signature on a referendum petition. Had "inactive" voters been included in the total, the requisite number of signatures would not have been sufficient.

Section 114 of the Montgomery County Charter refers only to the universe of registered voters: "Any legislation enacted by the Council shall be submitted to a referendum of the voters upon petition of five percent of the *registered voters* of the County. . . ." (emphasis added). We recently had the opportunity to interpret whether the term "registered voter" included "inactive" voters in *Maryland Green Party v. Maryland Board of Elections*, 377 Md. 127, 832 A.2d 214 (2003). In that case, the Maryland Board of Elections declined to certify a nominating petition for a Congressional candidate due to a lack of verifiable signatures on the petition; among the reasons cited for the rejection of over a thousand signatures was that many of the signatures were from "inactive" voters. At the time of *Green Party*, Section 1–101(mm) of the Election

---

(2) a petition governed by Title 6;

(3) a certificate of candidacy;

(4) an absentee ballot application; or

(5) a written affirmation of residence completed on election day to entitle the voter to vote either at the election district or precinct for the voter's current residence or the voter's previous residence, as determined by the State Board.

Law Article stated that " 'registered voter' does not include an individual whose name is on a list of inactive voters," and Section 3-504(f)(4) provided that "[i]ndividuals whose names have been placed on the inactive list may not be counted as part of the registry." We declared these provisions unconstitutional, because the Maryland Constitution, in speaking of registered voters, did not distinguish an "inactive" voter from a registered one; both are registered voters:

> [Section 2 of Article I of the Maryland Constitution [19]] contemplates a *single* registry for a particular area, containing the names of *all* qualified voters, leaving the General Assembly no discretion to decide who may or may not be listed therein, no discretion to create a second registry for " inactive" voters, and no authority to decree that an "inactive" voter is not a "registered voter" with all the rights of a registered voter. Furthermore, § 2 provides that, once registered, the registration shall be "conclusive" evidence of the right to vote. In other words, the Maryland Constitution does not require anything more from the voter on election day.

*Id.* at 142–43, 832 A.2d at 223. We held that "any statutory provision or administrative regulation which treats 'inactive' voters differently from 'active' voters is invalid" and remonstrated against maintaining a separate registry of "inactive" voters. *Id.* at 152–53, 832 A.2d at 229. *See also Gisriel v. Ocean City Board of Supervisors of Elections*, 345 Md. 477, 504, 693 A.2d 757, 770 (1997) ("[T]he 128 residents of Ocean

---

**19.** Section 2 of Article I of the Maryland Constitution states:

> The General Assembly shall provide by law for a uniform Registration of the names of all the voters in this State, who possess the qualifications prescribed in this Article, which Registration shall be conclusive evidence to the Judges of Election of the right of every person, thus registered, to vote at any election thereafter held in this State; but no person shall vote, at any election, Federal or State, hereafter to be held in this State, or at any municipal election in the City of Baltimore, unless his name appears in the list of registered voters; the names of all persons shall be added to the list of qualified voters by the officers of Registration, who have the qualifications prescribed in the first section of this Article, and who are not disqualified under the provisions of the second and third sections thereof.

City who had not voted in the preceding two general municipal elections, but whose names remained on the voter registration list, were not unqualified voters. In no event should their names be removed from the voter registration list."); *State Administrative Bd. of Election Laws v. Board of Sup'rs of Election of Baltimore City*, 342 Md. 586, 599, 679 A.2d 96, 102 (1996) ("[H]aving voted frequently in the past is not a qualification for voting and, under the Maryland Constitution, could not be a qualification. The 'inactive' voters who remained on the registration rolls and who continued to meet the constitutional qualifications for voting in Baltimore City, were not 'ineligible' voters.").

The Legislature responded to our decision in *Green Party* by amending former Sections 1–101(mm) and 3–504.[20] *See* 2005 Maryland Laws, Chapter 572. Section 3–503, which currently governs placement of voters on "inactive" status, as well as the restoration to "active" status, states:

(a) *In general.*—If a voter fails to respond to a confirmation notice under § 3–502(c) [21] of this subtitle, the voter's name shall be placed into inactive status on the statewide voter registration list.

---

**20.** Subsection (f) of Section 3–504 was also renumbered as Section 3–503 by Chapter 572 of the Maryland Laws of 2005. The same Act also eliminated "petition signature verification" from the list of purposes for which registrants, who are placed into "inactive" status, may not be counted. Because the two other official administrative purposes, establishing precincts and reporting official statistics, were preserved in the Statute, while "petition signature verification" was removed from the list, we find the Board's argument that petition signature verification should still be considered as an official administrative purpose unpersuasive.

**21.** Section 3–502(c) provides:

(c) *Change of residence outside State.*—If it appears from information provided by the postal service or an agency specified in § 3–504(b) of this subtitle that a voter has moved to a different address outside the State, the election official in the county where the voter most recently resided in the State shall send the voter a confirmation notice informing the voter of his or her potential inactive status as described in § 3–503 of this subtitle.

(b) *Restoration to active status.*—A voter shall be restored to active status on the statewide voter registration list after completing and signing any of the following election documents:

(1) a voter registration application;

(2) a petition governed by Title 6;

(3) a certificate of candidacy;

(4) an absentee ballot application; or

(5) a written affirmation of residence completed on election day to entitle the voter to vote either at the election district or precinct for the voter's current residence or the voter's previous residence, as determined by the State Board.

(c) *Removal.*—An inactive voter who fails to vote in an election in the period ending with the second general election shall be removed from the statewide voter registration list.

(d) *Counting for official administrative purposes.*—Registrants placed into inactive status may not be counted for official administrative purposes including establishing precincts and reporting official statistics.

 To the extent that this statute, however, permits the maintenance of two lists to determine an individual's registration status in order to exclude "inactive" voters from the list of registered voters, it is unconstitutional for the reasons stated in our decision in *Green Party.* We emphasize that there is no room, after our decision in *Green Party,* for the maintenance of an "inactive" list to define registration status, because both "active" and "inactive" voters are registered voters. The Legislature has "no authority to decree that an 'inactive' voter is not a 'registered voter' with all the rights of a registered voter," *Green Party,* 377 Md. at 143, 832 A.2d at 223, including the ability to petition for referendum under statutory and constitutional provisions.

 In the present case Montgomery County's 52,269 "inactive" voters were excluded from the total number of registered voters, thus greatly diminishing the number of

voters necessary to achieve the requisite 5% of registered voters. Had the County Board used all 552,281 registered voters, which includes both "active" and "inactive" voters, as opposed to only the 500,012 "active" voters, it would have determined that 27,615 petition signatures, not 25,001, were needed to achieve the 5% benchmark. Even were we to agree with the Circuit Court that only 26,813 [22] signatures are valid, which we do not, the petition would fail to meet the requisite 27,615 signatures necessary to meet the 5% requirement.

 The judge in the present case, however, also determined that 10,876 signatures that did not comport with the voter's registration identification were valid, because the dictates of Section 6–203 were suggestive rather than required. We disagree.

Section 6–203, which governs the process of signing a referendum petition and validating signatures on a referendum petition states, in pertinent part:

(a) *In general.*—To sign a petition, an individual shall:

(1) sign the individual's name as it appears on the statewide voter registration list or the individual's surname of registration and at least one full given name and the initials of any other names; and

(2) include the following information, printed or typed, in the spaces provided:

(i) the signer's name as it was signed;

(ii) the signer's address;

(iii) the date of signing; and

(iv) other information required by regulations adopted by the State Board.

---

**22.** The Circuit Court found that there were 26,813 valid signatures after disqualifying 70 signatures from the February 19, 2008 submission for various signature defects such as the circulator's affidavit predating the voter's signature, affixing signatures to pages where there are signs of possible fraud or other irregularities by the signer or circulator and miscellaneous problems. It should be noted that the Court did not disqualify 59 other signatures from the February 4, 2008 submission that the court found were invalid, yet time-barred.

(b) *Validation and counting.*—The signature of an individual shall be validated and counted if:

(1) the requirements of subsection (a) of this section have been satisfied;

(2) the individual is a registered voter assigned to the county specified on the signature page and, if applicable, in a particular geographic area of the county;

(3) the individual has not previously signed the same petition;

(4) the signature is attested by an affidavit appearing on the page on which the signature appears;

(5) the date accompanying the signature is not later than the date of the affidavit on the page; and

(6) if applicable, the signature was affixed within the requisite period of time, as specified by law.

(Emphasis added). The plain meaning of the words "shall" and "requirements" in Section 6–203 reflect that the statutory provisions require that the voter must sign his or her name "as it appears on the statewide voter registration lists or the individual's surname of registration and at least one full given name and the initials of any other names"; the provisions are mandatory, not suggestive. *See Barbre v. Pope,* 402 Md. 157, 172–73, 935 A.2d 699, 708–09 (2007) (stating that "[w]e begin our analysis by first looking to the normal, plain meaning of the language of the statute," reading the statute as a whole to ensure that " 'no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory,' " and "if the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions and our analysis ends"). "Shall" is defined as "[h]as a duty to; more broadly, is required to," Black's Law Dictionary 1407 (8th ed. 2004), while "require" means "to demand as necessary or essential." Merriam–Webster's Collegiate Dictionary 1058 (11th ed. 2005). We have heretofore interpreted the word "shall" to be mandatory in other cases in which we considered whether petition specifications are required or suggestive. In *City of Takoma Park v. Citizens for Decent Government,* 301 Md. 439, 442–44,

483 A.2d 348, 351 (1984), we were asked to consider whether the Montgomery County Board properly declined to certify a petition for referendum of a piece of legislation prohibiting discrimination in employment, housing and public accommodations on the basis of sexual orientation,[23] because it did not "comply with the legal requirements as to form" under Section 16–5 of Article 3, Montgomery County Code, which stated:

> A petition for referendum on any legislation, or part thereof, enacted by the council and subject to referendum under the charter, <u>shall</u> be composed of one or more sheets, each in substantially the following form:

### REFERENDUM PETITION

> "We, the undersigned registered voters of Montgomery County, Maryland, do hereby petition for a referendum vote on [the provisions (identifying them briefly) of] the Act entitled 'An Act [inserting title],' enacted by the County Council for Montgomery County, Maryland, at its [month and year] legislative session."

(Emphasis added). Those citizens protesting the Bill, however, provided only the Bill number and the following statement: "Those certain provisions hereby petitioned for a referendum vote are any mention or definition within the bill of the terms, 'sexual orientation, homosexuality, heterosexuality, or bisexuality.'" *Id.* at 443, 483 A.2d at 350. We concluded that the petition was insufficient, having not met the required statutory provisions of Section 16–5, because it failed to set forth the title of the act in question and did not inform voters of "precisely what portions of the act the petition sponsors proposed for deletion." *Id.* at 449, 483 A.2d at 354.

We also have had occasion to consider whether the signature requirements formerly set forth in Section 169, Article 33, Maryland Code (1957, 1964 Supp.), the precursor of the present Section 6–203, are required or suggestive, in *Barnes v.*

---

**23.** The legislation also prohibited housing discrimination against families with children. *City of Takoma Park v. Citizens for Decent Government,* 301 Md. 439, 483 A.2d 348 (1984).

*State ex rel. Pinkney,* 236 Md. 564, 204 A.2d 787 (1964). In *Barnes,* a restaurant owner contended that he did not violate the Public Accommodations Act when he refused to serve a customer based on race, because, he argued, the implementation of the law was suspended by a petition for referendum challenging the Act, which the Secretary of State had improperly refused to certify. The signature requirements at issue provided that:

> "In every petition (including an associated or related set of petitions) under the provisions of Article XVI of the State Constitution, there <u>shall</u> be appended to the signature of each signer his residence, the precinct or district wherein he is registered as a voter, and immediately below the signature of any such signer, there shall be either printed or typed, the name of such signer."

Maryland Code (1957, 1964 Supp.), Article 33, Section 169. (emphasis added). We approved of the Secretary's rejection of a number of petition signatures for failing to comply with the signatures requirement, which left the petition with an inadequate amount of valid signatures, and concluded that signature requirements "designed to provide additional means by which fraudulent or otherwise improper signatures upon a referendum petition may be detected" were required as opposed to merely suggestive, noting that signature requirements "facilitate checking of the petitions by interested persons to ensure that only qualified persons have signed." *Barnes,* 236 Md. at 571–72, 574, 204 A.2d at 791, 793.[24] *See*

---

**24.** The County Board argues that our conclusion that signature provisions are required as set forth in *Barnes v. State ex rel. Pinkney,* 236 Md. 564, 204 A.2d 787 (1964), has been overruled by the additions of Sections 6–203 and 6–207 to the Elections Laws. Recent amendments to the Sections, however, reflect otherwise. Sections 6–203 and 6–207 have been amended both recently and frequently; had the Legislature intended to overrule the standard we articulated in *Barnes,* they could have done so by removing the word "shall" in any of the numerous revisions to Section 6–203. *See* 2005 Maryland Laws, Chapter 572; 2002 Maryland Laws, Chapter 291, Section 4; 1998 Maryland Laws, Chapter 585, Section 2. Instead the Legislature chose to keep intact the mandate of Section 6–203: "To sign a petition, an individual *shall:* (a) sign the individual's name as it appears on the statewide voter registra-

*also Ferguson v. Secretary of State,* 249 Md. 510, 240 A.2d 232 (1968) (finding a petition to fail when it did not comply with the "mandatory requirement" that the person procuring the signatures attach an affidavit attesting to their personal knowledge that "the signers are registered voters of the State and City of Baltimore or county as set opposite their names").

The County Board argues, nevertheless, that the plain language of Section 6–203, governing validation, is not dispositive because the entire Section is rendered ambiguous by the interaction of it with Section 6–207,[25] dealing with verification. In this regard, the County Board is in essence arguing that the validation of signatures, which, for the purposes of this case, requires an election official to confirm that each entry includes the signature of the individual's name as it appears on the statewide voter registration list or at least one first name, the initials of any other names and a surname, must be construed liberally in light of the verification provisions, which require election authorities to "ensure that the name of the individual who signed the petition is listed as a registered voter." [26]

---

tion list or the individual's surname of registration and at least one full given name and the initials of any other names" and "[t]he signature of an individual shall be validated and counted if … the *requirements* of subsection (a) of this section have been satisfied."

**25.** Section 6–207 provides, in pertinent part:
(a)(1) *In general.*—Upon the filing of a petition, and unless it has been declared deficient under § 6–206 of this subtitle, the staff of the election authority shall proceed to verify the signatures and count the validated signatures contained in the petition.
(2) The purpose of signature verification under paragraph (1) of this subsection is to ensure that the name of the individual who signed the petition is listed as a registered voter.
State Board to establish process
(b) *State Board to establish process.*—The State Board, by regulation, shall establish the process to be followed by all election authorities for verifying and counting signatures on petitions.

**26.** The County Board also argues that we should show deference to the State Board's interpretation of the law it administers, citing *Christopher v. Montgomery County Dept. of Health and Human Services,* 381 Md. 188, 849 A.2d 46 (2004). In that case, however, we noted that although we ordinarily give weight to an agency's interpretation of a statute that

 We disagree that the verification provision renders the "validation" provision ambiguous; validation is a distinct step in the process that must occur before a signature can be verified.[27] The purpose of validation, relating to whether the signature is sufficient, is to "provide additional means by which fraudulent or otherwise improper signatures upon a referendum petition may be detected," *see Barnes*, 236 Md. at 571–72, 204 A.2d at 793, while the purpose of signature verification, relating to the existence of registration of the voter and the signature count, is to "ensure that the name of the individual who signed the petition is listed as a registered voter." Section 6–207. Because the two provisions are distinct, we are not persuaded that "shall" means anything other than mandatory.[28] Finding none of the County Board's argu-

---

it administers, "[d]etermining whether an agency's 'conclusions of law' are correct is always, on judicial review, the court's prerogative." *Id.* at 198, 849 A.2d at 52.

27. COMAR 33.06.05.02 as well as the State Board's "guidelines for petition verification process" provide additional guidelines and procedures for the verification, as opposed to validation, of signatures. Because we conclude that verification and validation are two distinct steps and the verification process is not at issue in the present case, we need not address the County Board's argument that COMAR 33.06.05.02, the State Board's "guidelines for petition verification process" or the legislative history to Section 6–207, which involves only verification, render Section 6–203, governing validation, ambiguous. The Board's reliance on *Kaczorowski v. Mayor and City Council of Baltimore*, 309 Md. 505, 513, 525 A.2d 628, 632–33 (1987) is inapposite for the same reason.

28. The County Board's reliance on *Roskelly v. Lamone*, 396 Md. 27, 912 A.2d 658 (2006), for the proposition that mandatory compliance with the signature requirements in Section 6–203 would lead to absurd results by omitting signatures that do not comply with Section 6–203 and on *Dutton v. Tawes*, 225 Md. 484, 491, 171 A.2d 688 (1961), for the proposition that mandatory compliance with signature requirements would inhibit the ability to seek referendum is unconvincing. As it applies to referendum petitions, the mandatory signature requirements of Section 6–203(a)(1) are not unduly burdensome, requiring a signer to provide only a surname, one full given name, the initials of any other names, the signer's address and date of signing. Additionally, the County Board's reliance on *Nader for President 2004 v. Maryland State Board of Elections*, 399 Md. 681, 926 A.2d 199 (2007), is inapposite. *Nader* did not deal with a referendum petition, but rather a statewide

ments persuasive, we decline the invitation to reverse our past holding that a signer is required to comply with the signature requirements governing petitions for referendum. Such a holding is in accord with our view that signature requirements "provide additional means by which fraudulent or otherwise improper signatures upon a referendum petition may be detected." *Barnes,* 236 Md. at 571–72, 204 A.2d at 793.

Because we hold that Jane Doe's judicial review action was not time-barred, that "inactive" voters should have been included in the total number of registered voters and finally that the 10,876 challenged signatures were invalid as a matter of law, the reversal of summary judgment entered on behalf of the County Board and entry of summary judgment on behalf of Jane Doe was mandated by this Court on September 9, 2008.

ADKINS, J., dissents with opinion in which HARRELL and MURPHY, JJ., join.

Dissenting Opinion by ADKINS, J., which HARRELL and MURPHY, JJ. join.

A cardinal rule of statutory interpretation is that we shall not insert or delete words of the statute. *See, e.g., Wheeler v. State,* 281 Md. 593, 598, 380 A.2d 1052, 1056 (1977), *cert. denied,* 435 U.S. 997, 98 S.Ct. 1650, 56 L.Ed.2d 86 (1978)("We are not at liberty to bring about a different result by inserting or omitting words to make the statute express an intention not evidenced in its original form."). Another rule is that we should not "find any word ... superfluous, meaningless, or nugatory, unless we have some clear indication to the contrary." *DeBusk v. Johns Hopkins Hosp.,* 342 Md. 432, 445,

---

nominating petition for a Presidential candidate. In this context, we held that a "county match" requirement was not necessary for validation purposes, because the "specific county in which a voter was registered was irrelevant" for the purposes of signing a petition applicable to citizens of every county in the State. *Id.* at 705, 926 A.2d at 213. Obviously, the process of validation is not irrelevant, serving as an important safeguard against fraud. *See Barnes v. State ex rel. Pinkney,* 236 Md. 564, 571–72, 574, 204 A.2d 787, 791, 793 (1964).

677 A.2d 73, 79 (1996). Because the majority's analysis and conclusion disregards both these rule, I respectfully dissent.

Maryland Code (2003, 2008 Supp.), § 6–209(a)(1) of the Election Law Article (EL) states that a "person aggrieved by a determination made under ... § 6–206 ... may seek judicial review[.]" Section 6–206(c)(3) of the Election Law Article, subtitled "Determinations at time of filing," directs that the chief election official of the election authority review a petition at the time of filing and determine whether the petition satisfies the "requirements of law for the number ... of signatures[.]"

On February 4, 2008, the Citizens Group submitted 15,146 signatures with the petition for referendum. On February 20, the County Board sent a letter to the Citizens Group stating that 13,476 of these signatures were "valid, accepted signatures," thus allowing the Citizens Group to proceed with its petition because it met the Montgomery County Code requirement that a petitioner file signatures with its petition equal to "fifty percent of the required signatures" within seventy-five days of the legislation becoming law.[1] *See* Montgomery County Charter § 115. (The other fifty percent must be filed fifteen days later.)

As I read Maryland's election code, the right of Jane Doe to challenge this determination is established by EL section 6–209. That section provides: "A person aggrieved by a determination made under § 6–202, § 6–206, or § 6–208(a)(2) of this subtitle may seek judicial review[.]" EL § 6–209(a)(1). Section 6–209 applies to the Board's determination that 2.5% of the County voters had signed the petition, because this determination relates to the "number of signatures," as called for in EL section 6–206.

---

1. Section 115 of the Montgomery County Charter provides:

Any petition to refer legislation to the voters of the County shall be filed with the Board of Supervisors of Elections within ninety days after the date on which the legislation shall become law, provided that **fifty percent of the required signatures accompanying the petition are filed within seventy-five days** after the date when the legislation becomes law. (Emphasis added.)

Section 6–210 establishes the time period for when a person must file a petition for judicial review. Under this law, "any judicial review of a determination, as provided in § 6–209 of this subtitle, shall be sought by the 10th day following the determination to which it relates." EL § 6–210(e).

I agree with the Circuit Court that Doe's challenge to the Board's determination on February 20, 2008 that the Citizens Group had filed 2.5% of the signatures required at the time, was filed too late because it was not filed within ten days of February 20, 2008. As the circuit court explained in its opinion:

> Plaintiffs ... judicially challenged the denominator too late. ... [A] a judicial challenge to the fixing of the denominator should have been filed on or before February 20, 2008, and perhaps earlier. Certainly, Plaintiffs had constructive notice of the denominator no later than that day, when the first set of signatures was verified and counted by Defendant.

> The court rejects Plaintiffs' suggestion made at the July 9 hearing that the date the petition was certified to the county executive is the measuring date for seeking judicial review. Certification under § 6–208 occurs at the *end* of the signature-gathering process. While it is true that § 6–209 provides for judicial review of the certification, it does not give Plaintiffs a second bite at the apple on the denominator issue.

> *Roskelly [v. Lamone,* 396 Md. 27, 912 A.2d 658 (2006)] mandates that where referendum petitioners are aggrieved by a rejection of signatures at the first step of the signature-gathering process, they are required to seek judicial review within 10 days of the determination.

> \* \* \*

Because their request for judicial review was filed on March 14, limitations bars any remedy.

In *Roskelly,* a citizens group and its chair, Thomas Roskelly (collectively, "Roskelly"), filed a petition for referendum on a new law allowing early voting in the 2006 elections. The new

law was passed in 2005, but then vetoed by the Governor. During the next legislative session in 2006, the legislature overrode the veto. Roskelly did not file its petition for referendum until after the override, on May 31, 2006, and he submitted 20,221 signatures in support thereof.

By letter from chief election official Linda Lamone dated June 8, 2006, the Maryland State Board of Elections rejected Roskelly's petition as untimely on the grounds that Roskelly waited until 2006 to file a petition, rather than filing it in the year the legislation originally passed. According to Lamone's letter, the Maryland Constitution required that a petition for referendum be filed in the same year as passage of the bill.[2] Roskelly did not take any appeal from the Board's June 8, 2006 determination.

On June 21, 2006, the Board informed Roskelly that the petition was deficient for another, independent reason, i.e., Roskelly was required under the Maryland Constitution to file one-third of the total required signatures before June 1, 2006.[3] Roskelly failed to file a sufficient number of valid signatures by June 1, and Lamone, after counting the signatures, notified him on June 21, 2006 that, for such additional reason, his petition was deficient. Roskelly filed a petition for judicial review within ten days of this letter.

The Court explained how these two determinations by the Election Board interrelated:

---

**2.** Lamone advised that " 'a referendum effort must occur immediately after the regular session at which the legislation is initially passed. Thus, the required signatures should have been filed no later than June 1, 2005.' " *Roskelly v. Lamone*, 396 Md. 27, 33, 912 A.2d 658, 661–62 (2006).

**3.** Maryland Constitution, Art. XVI, Section 3(b) provides, in pertinent part:

If more than one-third, but less than the full number of signatures required to complete any referendum petition against any law passed by the General Assembly, be filed with the Secretary of State before the first day of June, the time for the law to take effect and for filing the remainder of signatures to complete the petition shall be extended to the thirtieth day of the same month, with like effect.

If, as Lamone maintains and the trial court found, the June 8 letter contained a **determination** by Lamone, that determination was properly and timely made and mailed to the appellants, the appellants sought judicial review too late and we must affirm the trial court's dismissal of their action, notwithstanding the timeliness of the action with respect to signature count and validation.

*Id.* at 46, 912 A.2d at 669–70 (emphasis added). It then summarized Roskelly's argument on appeal:

The appellants renew in this Court the argument they advanced in the Circuit Court, that the determination by the State Administrator in the June 8 letter was premature since their May 31 submission, because it was not complete, *i.e.* did not contain the full number of the required signatures and contemplated a subsequent filing, was not the petition. Proceeding from that premise, they further argue that the signature validation process also was premature-until the complete petition is filed, they maintain, neither a determination as to the sufficiency or deficiency of the incomplete petition nor the sufficiency of the number of signatures it contains is appropriate.

*Id.* at 47, 912 A.2d at 670 (footnote omitted). The Court affirmed the lower court's judgment dismissing the appeal.

The majority's holding in this case is comparable to Roskelly's argument that the election administrator's June 8 notification to Roskelly was interlocutory and no appeal need be taken from it. The Court in *Roskelly rejected* Roskelly's notion that there could be no appealable determination until 100% of the necessary signatures were filed. But here, the majority *embraces* that concept in holding that the Board's determination that the 13,476 validated signatures complied with the "fifty percent within 75 days" requirement of Montgomery County Charter Section 115, was not appealable under EL section 6–209 because it was only the first step in a two step signature gathering process.

The *Roskelly* Court's rejection of this contention, its holding that the State Administrator could make more than one appealable determination, and that it was a "two-step pro-

cess," persuades me that we should reject Doe's comparable contention in this case. In the words of Chief Judge Bell, speaking for the Court in *Roskelly:*

To refer a law to the vote of the people requires, **whether done in one step or two, the filing,** before the constitutionally prescribed deadline, **of a minimum number of signatures** with the Secretary of State. Section 2 of Article XVI states explicitly what is to be filed, a "petition." That is true whether the filing is to be a single one or two. **To be successful, both requirements-the filing of the petition and the requisite number of signatures before June 1– must be met.** Although **in the case of the two-step process,** an additional thirty days, is afforded for the gathering and filing of the signatures, **that additional time is obtainable only when the threshold filing of the petition, containing a specified number of signatures, has timely occurred.** Entitlement to proceed to the second step, in **other words, is dependent upon the sufficiency of the compliance in the first step** . . . .

[B]ecause what the appellants filed was a referendum petition, the State Administrator was required to, as she did, review it, EL § 6–205(a), **with an eye toward determining its sufficiency or deficiency and making the required determinations.** EL § 6–206. To be sure, the State Administrator advised the appellants of her conclusion that the petition was deficient and she was not required to do more. Nevertheless . . . she proceeded to verify the signatures and count the validated ones. EL § 6–210. In addition to the reasons stated, this was done, and was necessary, precisely because the **appellants' right to file additional signatures was dependent on whether they had filled the required number prior to the deadline.** Whether a referendum petition filed pursuant to § 3(b) is valid is determined by reference to whether it contained, when filed, the required number of valid signatures-more than one-third of the number needed to complete the petition.[4]

---

4. The Court explained that it would not decide the other issue on appeal:

*Id.* at 51–52, 912 A.2d at 672–73 (emphasis added). This Court held that Roskelly failed to meet the ten day window for filing his petition for judicial review of the Election Board's June 8 determination that the petition was required to be filed in 2005. Doe is in a similar position here. I would apply that holding here, reasoning that when the Board accepted 13,476 of the Citizens Group's first batch of signatures on February 20, 2006, determining that they constituted one-half of the signatures required, the first step in this two-step process was completed.

This determination resolved the question of how many voters' signatures were needed to fulfill the requisite 2.5 % of registered voters, and correspondingly, the number that would constitute 5%. Doe had an opportunity to appeal this determination, but chose not to do so. I share the Circuit Court's view that the ten day window set by EL section 6–210(e) was the only opportunity to judicially challenge this decision.

The majority distinguishes *Roskelly* on grounds that "Roskelly, as the petition sponsor was 'aggrieved' on June 8 when a final determination denying certification was made." It holds that Doe was not aggrieved on February 20, and would only become aggrieved if the Citizens Group met all of the legal requirements for a referendum, including filing 100% of the requisite signatures.

I appreciate the difference in position between Roskelly and Doe, in that Doe's objective might have been achieved without judicial review if the Citizen's Group had failed to complete the second stage of the referendum process. But the majority cites no authority for the proposition that the term "aggrieved person" in EL section 6–209 means that there must be no

---

We note at the outset, whether correct or not, an issue that we need not decide here; Lamone advised the appellants, consistent with her counsel's advice, that their attempt to refer Senate Bill 478 to referendum was untimely, as the petition was not filed in the year it was passed. That was a determination of deficiency she was required by § 2–206(c)(5) to make. The appellants did not timely respond to this determination by seeking judicial review.
*Id.* at 47, 912 A.2d at 670.

possibility that the party seeking referendum will fail in the second stage of the process. If the legislature had intended this result, it could easily have said that no judicial review will occur until the chief election official certifies under EL section 6–208 that the petition process has been completed.

The majority's invoking the "aggrieved" requirement to prop up its ruling does not change the simple truth that the word "final" does not appear in either EL section 6–209 or EL 6–210. Under the majority's view, EL section 6–209(a)(1) would read as follows:

A person aggrieved by a [**final**] determination made under § 6–202, § 6–206, or § 6–208(a)(2) of this subtitle may seek judicial review[.]

Similarly, EL section 6–210(e) would read:

[A]ny judicial review of a determination as provided in § 6–209 of this subtitle, shall be sought by the 10th day following the [**final**] determination to which it relates.

In ruling as it does, not only does the majority insert the word "final" into the statute, but it fails to recognize that the statute uses two different terms: "determination[,]" on the one hand, and "certification" on the other. The latter does not occur until the "conclusion of the verification and counting processes[.]" EL § 6–208(a). At that time, "[i]f the chief election official determines that a petition has satisfied all requirements established by law relating to that petition, the chief election official shall certify that the petition process has been completed[.]" EL § 6–208(b). Instead of recognizing both "determination" and "certification" as distinct words, the majority fuses the two into one term—"final determination." To do so violates the familiar rule of statutory construction that "absent a clear intent to the contrary, a statute is to be read so that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless, or nugatory." *Montgomery County v. Buckman*, 333 Md. 516, 523–24, 636 A.2d 448, 452 (1994).

There is nothing else in the statute, moreover, that suggests that the legislature intended this interpretation. Adding

these words does not resolve an inconsistency elsewhere in the statute. Nor is this interpretation more consistent with the purpose of the statute than one that treats the words as they were written. Indeed, the plain words of the statute create a more sensible statutory scheme in that they permit any legal issue about the number or geographical distribution of the required signatures to be resolved more in advance of the election. This gives election officials and the disputing sides of the issue more time to prepare for the election. The party seeking referendum has time to obtain additional or different signatures before the ninety-day deadline has expired. The party favoring the initial legislation has additional time to prepare to defend it in the minds of the voting public.

The necessity for a compressed time period in which to conduct the referendum process, including judicial review thereof, was obviously a concern for the legislature. In establishing the schedule for the referendum process in EL section 6–210, it imposed a five day limit on the election official to provide an "advance determination"; it gave the chief election official only twenty days to perform the verification and counting of the validated signatures on a petition; and instituted a twenty day limitation for filing a petition for judicial review of a determination. As all of these time frames are shorter than those seen in other contexts, I discern a legislative effort to shorten the process in order to facilitate an orderly election process.

The majority justifies its insertion of the word "final" into both EL sections 6–209 and 6–210 by relying on three administrative law cases, which apply the rule that ordinarily an appeal from an administrative contested case proceeding can only be taken from a final judgment. The present case, however, fits perfectly within one of the exceptions to the rule: exhaustion is not required when the legislature "has indicated its intent that a statutory administration [sic] remedy need not be invoked and exhausted under some circumstances." *Md. Comm'n on Human Relations v. Mass Transit Admin.*, 294 Md. 225, 232 n. 4, 449 A.2d 385, 388 n. 4 (1982) (citing *White v. Prince George's County*, 282 Md. 641, 649, 387 A.2d 260

(1978)); *Md.-Nat'l Capital Park & Planning v. Wash. Nat'l Arena*, 282 Md. 588, 595–96, 386 A.2d 1216 (1978). Unlike the administrative law cases that are cited by the majority, this case involves the statutory referendum process. In enacting Title 6 of the Election Law Article, the legislature recognized the need for a compressed time frame that would allow a more speedy judicial resolution of a challenge to the County Board's determination than would a more typical agency decision. It clearly did so by using the term "a determination" rather than "a final determination," "certification" or other term indicating the end of the referendum petition process. *Cf., e.g.*, Md.Code (1999, 2008 Repl.Vol., 2008 Supp.), § 10–309(a)(1) of the Correctional Services Article ("A claimant aggrieved by a final determination of the Board may file a petition for judicial review in the circuit court of the county where the injury occurred or where the claimant resides."); Md.Code (2001, 2008 Repl.Vol.), § 11–630 of the Criminal Procedure Article ("A person aggrieved by a final determination and order of the Attorney General under Part II of this subtitle may seek judicial review.")

For the reasons stated above, I would affirm the Circuit Court, on the basis that Doe failed to file a timely petition for judicial review of the Board's February 20 determination.

Judges HARRELL and MURPHY authorize me to state that they join this Dissent.